279 U.S. 768 (1929)
ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY ET AL.
v.
UNITED STATES ET AL.
No. 466.
Supreme Court of United States.
Argued April 11, 1929.
Decided June 3, 1929.
APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.
*770 Mr. R.S. Outlaw, with whom Messrs. A.B. Enoch, H.H. Larimore, E.E. McInnis, M.L. Bell, W.F. Dickinson, and E.J. White were on the brief, for appellants.
Mr. Daniel W. Knowlton, with whom Attorney General Mitchell and Mr. Elmer B. Collins, Special Assistant to the Attorney General, were on the brief, for appellees United States and Interstate Commerce Commission.
Mr. Frank H. Towner, with whom Messrs. Silas H. Strawn, Frank H. Moore, and Wm. E. Davis were on the brief, for appellees Kansas City Southern Railway Company et al.
MR. JUSTICE BRANDEIS delivered the opinion of the Court.
This suit was brought in the federal court for northern Illinois, under the Urgent Deficiencies Act of October 22, 1913, c. 32, 38 Stat. 208, 220, to enjoin and annul an order of the Interstate Commerce Commission entered July 6, 1927. That order directed the Atchison, Topeka and Santa Fe and two other railroads to cancel proposed tariffs increasing the respective grain rates from numerous country points in Colorado, Kansas and Nebraska to Kansas City, Missouri, and Wichita, Kansas. Grain and Grain Products from Colorado, Kansas and Nebraska to Gulf Ports for Export, 129 I.C.C. 261. Those three carriers are the plaintiffs. Besides the United States and the Commission, the Kansas City Southern, and certain other carriers, which compete with the plaintiffs for the grain export traffic from Kansas City to Gulf ports, are the defendants. The District Court, three judges sitting, denied the injunction and dismissed the bill. 33 F. (2d) 345. The case is here on direct appeal from the final decree. We are of opinion that it should be affirmed.
The legal question presented is not dependent upon the fact that the tariffs challenged are those of three independent *771 railroads; nor upon the fact that the rates are different for wheat than for some other grain; nor upon the fact that the tariff of each railroad includes differing rates from numerous country points in each of the three States; nor upon the fact that some of the rates from those points are for transportation to Kansas City, and some to Wichita; nor upon the fact that there are several railroads which, as competitors of the plaintiffs for traffic from those cities to several Gulf ports, are affected by the rates challenged. The statement of the facts may, therefore, be simplified by limiting it to a single rate of one of the plaintiff carriers for wheat to Kansas City; and showing the effect of that increased rate on one of that carrier's competitors for traffic from that market to a single Gulf port.
The Santa Fe has a line direct from Dodge City, Kansas, to the Gulf via which its through rate on wheat for export is 47 cents per 100 pounds. It has also a line from Dodge City via Kansas City to the Gulf on which its through rate, prior to 1924, was 51 cents, being the sum (or combination) of the local rate from Dodge City to Kansas City (20.5 cents) and the standard proportional rate from Kansas City to the Gulf (30.5 cents).[1] Usually, the volume of grain in storage at Kansas City is large, as it is an important primary grain market. The Kansas City Southern has no line from Dodge City to Kansas City. *772 But it has a line from Kansas City to the Gulf; and its standard proportional rate also is 30.5 cents per 100 pounds. Prior to 1924, the Southern was in a position to compete on equal terms with the Santa Fe for the transportation to the Gulf of the grain from Dodge City on storage in Kansas City. In that year, the Santa Fe reduced its through rate from Dodge City to the Gulf via Kansas City to 47 cents. Thereby the Santa Fe's net proportional rate from Kansas City to the Gulf was reduced 4 cents, that is, from 30.5 cents to 26.5 cents. For, under a practice prevailing at primary grain markets, known as the through rates with transit privilege, one who re-ships grain on the same railroad which had brought it into the market is entitled to re-ship on what is called the balance of the through rate. That is, a discount is allowed equal to the difference between the through rate from the point of its origin to the destination ultimately selected and the sum of the standard inbound and outbound rates.
Thus, the Southern was disabled from competing with the Santa Fe for the transportation from Kansas City to the Gulf of grain in storage at Kansas City which had come from Dodge City. For the Santa Fe refused to establish a similar through route via the Southern from Kansas City; and the Commission did not order it. Compare St. Louis Southwestern Ry. Co. v. United States, 245 U.S. 136. The Southern undertook to help itself. It filed a tariff with what is called a varying proportional rate by lowering to 26.5 its own rate from Kansas City to the Gulf on such grain as had come to Kansas City from Dodge City.[2] The Santa Fe protested to the Commission *773 against the Southern's varying proportional rate; but the Commission refused to suspend it.[3] Then, the Santa Fe, in order to exclude the Southern, filed the tariff here in question, imposing the 4-cent addition to its Kansas City rate on any Dodge City grain that should later be re-shipped over the Southern's line. It is this conditional addition of 4 cents to the Dodge City-Kansas City rate which the Commission ordered cancelled.
The order followed extensive hearings before the Commission, had after suspension of the tariffs pursuant to paragraph 7 of § 15 of the Interstate Commerce Act. Since the proposed tariff involved an increase in the rate, the burden of justifying the increase before the Commission was imposed upon the carrier by paragraph 7 of § 15, if applicable. Moreover, to make an additional charge for having brought merchandise into a city if it should afterwards be shipped out, is on its face unreasonable. And it is discriminatory to make that additional charge only *774 if the outbound shipment is over one of several possible railroads. The Santa Fe made no attempt to justify the increase. It contended that the general rules of law concerning reasonableness of rates are not applicable; and that the Commission lacked power to order the rate cancelled, because by so doing it compelled the Santa Fe to participate in a through route and rate and thereby short haul itself, in disregard of the limitations imposed by paragraph 4 of § 15 upon the Commission's power to establish through routes. Compare United States v. Missouri Pacific R.R., 278 U.S. 269.
The Santa Fe, regarding the grain in storage at Kansas City as tonnage which, although temporarily held in abeyance, is in the course of a through movement and, as such, is to be held on its lines, makes this argument: At the time that the cancelled tariff was filed, the Santa Fe had a through route on its own lines from Dodge City via Kansas City to the Gulf; and there existed no through route from Dodge City to the Gulf via the Southern from Kansas City. The Santa Fe was therefore legally entitled to carry to the Gulf at the through rate all Dodge City grain stored at Kansas City, which had been brought in by it. The Southern's varying proportional rate on Dodge City grain enabled the Southern to secure some of this grain. The Santa Fe's proposed varying rate was essential to prevent that invasion of its right not to be short hauled on Dodge City grain. By ordering its proposed tariff cancelled, the Commission made possible a through route via the Southern which compelled the Santa Fe to short haul itself. As the Commission was prohibited by paragraph 4 of § 15 from establishing a through route via the Southern which would short haul the Santa Fe, Congress must have intended to deny to it also the power to cancel as unreasonable a tariff which was essential to the preservation of the Santa Fe's long haul.
*775 A supplemental argument is made by the Santa Fe to overcome the finding of the Commission that, at the time when the tariff here in question was filed, there already existed (without any order by the Commission) a through route for grain over the Santa Fe from Dodge City to Kansas City and thence to the Gulf via the Southern. Compare St. Louis Southwestern Ry. Co. v. United States, 245 U.S. 136, 139; Virginian Ry. v. United States, 272 U.S. 658, 666. The supplemental argument is this: Since the Commission could not have ordered this through route via the Southern, it could not prevent the Santa Fe's withdrawing from the same.[4] Its proposed tariff was in effect a withdrawal. For, as the bill alleges, the rates were "published, not for the purpose of facilitating movement via the routes in connection with which they were published, but were published by plaintiffs to preclude and prevent movement via such routes." We have no occasion to consider the issue of fact whether there was in existence when the Santa Fe filed its proposed tariff a through route from Dodge City via the Southern from Kansas City; nor need we consider the issue of law whether, if there was such a route in existence, the Commission would have been powerless, by reason of paragraph 4 of § 15, to prevent the Santa Fe's withdrawal *776 from it. For we are of opinion that, although the Santa Fe brought the grain into Kansas City, there is nothing in the situation which precluded the Commission from cancelling the Santa Fe's proposed tariff as being unreasonable.
First. In ordering cancellation of the proposed tariff the Commission exercised only its function of determining the reasonableness of rates. It made a rate order to which the matter of routing was merely an incident. The Santa Fe calls the proposed rate by which it undertook to add 4 cents to the Dodge City-Kansas City rate, if the grain should be re-shipped on the Southern, proportional. To call it proportional is misleading.[5] But if it were truly a part of a through rate, the fact would be without legal significance. The Commission's power to declare rates unreasonable applies alike to all rates, be they joint, local or proportional. The Commission may, and in controversies involving through rates often does, deal with one factor only of the combination of rates which make up the through rate. And that factor may be a proportional rate.[6]
The broad power to pass on the reasonableness of rates conferred upon the Commission in 1887 has not been in terms limited by any amendatory act. On the other hand, there has been much legislation designed to make the power more effective.[7] The special power to establish *777 through routes and joint rates was not conferred until 1906. Act of June 29, 1906, c. 3591, § 4, 34 Stat. 584. There is not in that Act as amended, see United States v. American Express Co., 265 U.S. 425, 430, note 2, or in any decision of this Court construing it;[8] or in any of the decisions of the Commission applying it, to which attention has been called,[9] the slightest basis for the suggestion that in conferring the restricted power to establish through routes, Congress intended to limit the theretofore unrestricted power of the Commission to pass upon the reasonableness of rates. Compare Nashville, Chattanooga & St. Louis Ry. Co. v. Tennessee, 262 U.S. 318, 323.
Second. The contention that the Santa Fe's cancelled tariff was legally part of a through rate is also unsound. The argument rests upon a fiction  the fiction of a through rate with transit privilege. As applied here, the fiction is inconsistent with every fact of legal significance. When grain is shipped from a country point to a primary market its ultimate disposition is rarely known. Who the owner of the grain will be when it reaches the primary market is uncertain. It may be sold en route before arrival there. While stored there, it may be resold several times. Some of it may be consumed in local flour mills. Most of that stored in local elevators will probably be shipped out. But until the grain is shipped out it will not be known to what place or even in what direction *778 or by what railroad it will be carried. Southern Kansas Grain Ass'n v. Chicago, Rock Island & Pacific Ry. Co., 139 I.C.C. 641, 666. The treatment of substantially all grain coming from the country point is this: The bill of lading is for a shipment from the country point to the primary market. There is nothing in any of the papers connected with that transportation to indicate that the grain has a destination beyond the primary market. Upon arrival there, the owner requires delivery to be made at such elevator or other place as he selects. The freight charges are paid; the amount being the full local rate for transportation from the country point to the primary market.[10] The car is then released. And the movement  called inbound  ends.
The practice by which grain shipped to a primary market is given when shipped out the benefit of the low rate which would normally have applied if the grain had actually been shipped from the country point through to its ultimate destination antedates the enactment of the Interstate Commerce Act, Transit Case, 24 I.C.C. 340, 348. The benefit attaching to grain shipped into the primary market is commonly so broad that it is transferable not only to another owner of the same grain, but to like grain coming from the same country point. Thus, the owner of any grain in Kansas City can get the benefit of the proportional rate out for Dodge City grain by making proof that he had brought from there into the market, within the period of twelve months, an equivalent quantity of like grain. This he may do although it appears that the grain which he brought in was actually consumed *779 in Kansas City.[11]Alleged Unlawful Rates and Practices in the Transportation of Grain and Grain Products, 7 I.C.C. 240, 247; In re Substitution of Tonnage at Transit Points, 18 I.C.C. 280; Transit Case, 24 I.C.C. 340.[12] The practice prevails often even where the haul to the primary market is out-of-line; that is, is not on the direct route from the point of origin to the point which ultimately becomes the destination of the grain.
When the outbound shipment from Kansas City is made the grain goes forward on a new bill of lading at the balance of the through rate. Obviously, this practice cannot convert the independent shipment of grain from Kansas City to the Gulf via the Southern into a through movement from Dodge City to the Gulf. The two transportation services are not only entirely distinct, but they are often rendered in respect to wholly different merchandise. This convenient fiction is employed as a justification *780 for the discrimination involved in giving rates lower than those ordinarily applicable to the service outbound. It is, of course, true that a carload of grain might be shipped from Dodge City to the Gulf as a through shipment, although under the transit privilege it is to break bulk at Kansas City, and the grain is not only to be stored there, but is to be treated or even converted into flour, before it proceeds on its journey to the Gulf. See Central R.R. Co. v. United States, 257 U.S. 217, 237. Compare Texas & New Orleans R.R. v. Sabine Tram Co., 227 U.S. 111; Baltimore & Ohio Southwestern R.R. v. Settle, 260 U.S. 166; Carson Petroleum Co. v. Vial, 279 U.S. 95. But the grain with which the carriers are here concerned is not that so shipped from Dodge City to the Gulf. It is grain whose only destination, when shipped from Dodge City, was Kansas City. Such reshipment under the transit privilege is also entirely unlike the through shipment effected under the reconsignment or diversion privilege. See Reconsignment Case, 47 I.C.C. 590; Wood v. New York, Philadelphia & Norfolk R.R. 53 I.C.C. 183, 185; Carolina Portland Cement Co. v. Director General, 83 I.C.C. 388, 391.
The grain, while in storage at Kansas City, is, in every sense, free grain. When delivered to elevators in Kansas City the Santa Fe's charges for the carriage to Kansas City were fully paid. Its legal interest therein ended then. If the consignee or his successor in title should at any time thereafter conclude to ship elsewhere grain which he had brought into Kansas City, he was at liberty to select not only the destination, but the carrier by which it should be transported. And every railroad serving Kansas City had like liberty to compete for the traffic. There is no rule of law or practice which gives to a carrier the right to recapture traffic which it originated. Compare United States v. Illinois Central R.R. Co., 263 U.S. 515, 523; United States v. American Ry. Express Co., 265 U.S. *781 425. Moreover, here the competition is not for transportation of the identical merchandise.
Third. In this Court, there is a faint contention that the evidence before the Commission did not support the finding of unreasonableness. It was not made either before the Commission or the District Court and is clearly unfounded. See Virginian Ry. Co. v. United States, 272 U.S. 658, 665; Assigned Car Cases, 274 U.S. 564, 580. There is also a suggestion that the Commission should have suspended and ordered cancelled the Southern's varying proportional rate. Its action in that respect is not subject to review in this proceeding.
Affirmed.
NOTES
[1] A through rate is ordinarily lower than the combination of the local rates. When a through rate is made by combination of rates for intermediate distances the rate for the later link in the shipment is, when lower than the local, spoken of as a proportional rate. See Hocking Valley Ry. Co. v. Lackawanna Coal & Lumber Co., 224 Fed. 930, 931. Also, Railroad Commissioners of Kansas v. A.T. & S.F. Ry. Co., 22 I.C.C. 407; Swift & Co. v. Director General, 66 I.C.C. 409; Kansas City Board of Trade v. Atchison, Topeka & Santa Fe Ry. Co., 69 I.C.C. 185; Rates on Bunker Coal, 73 I.C.C. 62; Lumber from San Francisco Bay Points, 78 I.C.C. 760; Wichita Chamber of Commerce v. Alabama & Vicksburg Ry. Co., 109 I.C.C. 368.
[2] This varying proportional rate was less advantageous to the Southern than if a joint rate had been established by agreement with the Santa Fe. For in acting alone, the Southern was obliged to absorb the whole of the 4-cent reduction; whereas, if the Santa Fe had joined with the Southern in establishing a through route and a joint rate, the 4-cent reduction would presumably have been divided between the two carriers.
[3] Varying proportional rates had been approved in Export Rates on Grain, 31 I.C.C. 616. The occasion for such rates and their operation are described in Southern Kansas Grain Association v. Chicago, Rock Island & Pacific Ry. Co., 139 I.C.C. 641, 653. "The method of publication may be briefly explained by the statement that proportional rates are provided from Kansas City in varying amounts depending upon the point of origin of the grain, which, when added to the local rates into Kansas City, are equal to the specific rates published by the lines which originate the grain. If these varying proportionals or balances were not maintained the lines which serve Kansas City, but not the grain fields, would be compelled to apply the flat proportional rate of 30.5 cents from that market to the Gulf ports. That flat proportional exceeds the balances maintained by other lines and therefore would attract little, if any, traffic. By providing these varying proportionals the lines serving Kansas City have placed themselves on a competitive basis for the outbound movement of grain stored at that point." Compare Grain and Grain Products from Kansas and Missouri to Gulf orts, 115 I.C.C. 153.
[4] In support of this proposition the Santa Fe relies upon Marble Rates from Vermont Points, 29 I.C.C. 607; Ogden Gateway Case, 35 I.C.C. 131; Ocean-and-Rail Rates to Charlotte, N.C., 38 I.C.C. 405; West Coast Lumber Mfgs. Ass'n v. S.P. & S. Ry. Co., 45 I.C.C. 230; Routing on Sheep from K.C., M. & O. Texas Points, 69 I.C.C. 4; Restrictions in Routings over S.L. & U.R.R., 115 I.C.C. 357; Port of New York Authority v. Atchison, Topeka & Santa Fe Ry. Co., 144 I.C.C. 514. But see Lake & Lake Rate Cancellations, 42 I.C.C. 513, 516; Western Pacific R.R. v. Southern Pacific Co., 55 I.C.C. 71, 73; Routing on Coal from Western Maryland Ry. Mines, 66 I.C.C. 103; Armour & Co. v. D.L. & W.R.R., 66 I.C.C. 445; Fruits & Vegetables from Texas Points, 74 I.C.C. 575, 578-579.
[5] See note 1.
[6] Compare Cairo Board of Trade v. C.C.C. & St. L. Ry. Co., 46 I.C.C. 343; Atchison Board of Trade v. A.T. & S.F. Ry. Co., 80 I.C.C. 350; Basing Rates on Paving Brick, 100 I C.C. 390.
[7] Act of June 29, 1906, c. 3591, § 4, 34 Stat. 584; Act of June 18, 1910, § 12, c. 303, 36 Stat. 539; Act of August 9, 1916, c. 301, 39 Stat. 441; Act of August 9, 1917, c. 50, § 4, 40 Stat. 270; Act of February 28, 1920, c. 91, § 418, 41 Stat. 484; Joint Resolution, approved January 30, 1925, 43 Stat. 801; Act of March 4, 1927, c. 510, § 2, 44 Stat. 1446.
[8] See Interstate Commerce Commission v. Northern Pacific Ry., 216 U.S. 538; Louisville & Nashville R.R. v. United States, 238 U.S. 1, 18; St. Louis S.W. Ry. Co. v. United States, 245 U.S. 136; Manufacturers Ry. Co. v. United States, 246 U.S. 457; New England Divisions Case, 261 U.S. 184; United States v. Illinois Central R.R., 263 U.S. 515; United States v. Missouri Pacific R.R., 278 U.S. 269.
[9] See cases in note 4, supra; also, Wichita Board of Trade v. A. & S. Ry. Co., 28 I.C.C. 376; Restriction in Routing of Traffic from Pacific Northwest, 73 I.C.C. 305; Lemon-Cove-Woodlake Ass'n v. A.T. & S.F. Ry. Co., 139 I.C.C. 239.
[10] If the then owner has directed delivery of the car to some local elevator, not on the line of the carrier which brought the grain to Kansas City, he pays the switching charge.
[11] The outbound proportional as so reduced is spoken of as the transit balance. The proof that the shipper brought grain into the market entitling him to the reduction is made by presentation of what is called "expense bills." This substitution has by some carriers been extended to grain coming from other country points with rates equally favorable to the carrier. The validity of that practice has at times been questioned. See In re Substitution of Tonnage at Transit Points, 18 I.C.C. 280, 284-285. Compare Alleged Unlawful Rates, 7 I.C.C. 240, 244; Transit Case, 24 I.C.C. 340, 350; Lathrop-Marshall Grain Co. v. Chicago & Northwestern Ry. Co., 144 I.C.C. 227, 228. As to rate-breaking points, see Wichita Board of Trade v. Abilene & Southern Ry. Co., 29 I.C.C. 376; Mississippi R.R. Commission v. Alabama & Vicksburg Ry. Co., 93 I.C.C. 435, 444.
[12] Compare Nonapplication of Transit Privileges on Deficiencies in Weight of Grain, 69 I.C.C. 19; Southern Kansas Grain Assn. v. Chicago, Rock Island & Pacific Ry. Co., 139 I.C.C. 641, 646; Lathrop-Marshall Grain Co. v. Chicago & Northwestern Ry. Co., 144 I.C.C. 227; Omaha Corporation Commission v. Abilene & Southern Ry. Co., 148 I.C.C. 316, 320.