## COLUMBUS & GREENVILLE RY. CO. v. UNITED STATES et al.

### No. 161.

District Court, E. D. Mississippi, N. D.

July 31, 1942.

Forrest B. Jackson, of Jackson, Miss., R. C. Stovall, of Okolona, Miss., and Z. P. Hawkins, of Columbus, Miss., for Columbus & Greenville Ry. Co.

Daniel H. Kunkel, Office of Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for Interstate Commerce Commission.

Robert L. Pierce, Sp. Atty., Department of Justice, of Washington, D. C., for United States.

John E. McCullough, of St. Louis, Mo., for St. Louis-San Francisco Ry. Co.

Erle J. Zoll, Jr., of Chicago, Ill., for Illinois Cent. R. Co.

Before HOLMES, Circuit Judge, and DAWKINS and MIZE, District Judges.

MIZE, District Judge.

The validity of the order of the Interstate Commerce Commission requiring the plaintiff, C. & G. Railway Company, to cancel certain provisions of a cut-back rate tariff is. posed for determination by this suit. The Commission found plaintiff's freight tariff 9-B I.C.C. No. 81 to be in violation of 'sections 1(6), 6(4), and 6(7) of the Interstate Commerce Act, 49 U.S.C.A. § 1(6), 6(4, 7). The basis for the Commission's action is contained in two reports, being I. & S. Docket No. 4599, 238 I.C.C. 309, and No. 28590 decided January 3, 1942. The last mentioned report being the one that is particularly in controversy, the record and report of the former being made part of the record in the latter.

The facts in the case are not in dispute. The tariff provisions which the Commission has condemned, provide that when cottonseed is transported by a railroad other than the C. & G. Railway Co. to a mill point and is there processed and its products subsequently reshipped over the line of C. & G. Railway Co. the C. & G. Railway Co. will make a prescribed refund to the shipper, based upon the inbound shipment and the length of movement from origin to milling point. This provision is contained in plaintiff's tariff No. 81, being Item 5 thereof, and which provides that it shall be applicable on cottonseed in carloads from stations on the C. & G. Railway and on cottonseed from stations on connecting lines via such lines to mill points on the C. & G. Railway where in both cases subsequent shipment of the product is made from such mill points via the C. & G. Railway. Item 40 of the tariff provides for a scale of rates based upon the distance of the inbound movement.

The effect of this tariff is that the schedule of rates prescribed is used as a measure for making refunds on the subsequent reshipments of the product out of the mill point and is not applied in the first instance upon the inbound movements. On inbound movement a local rate is charged and collected and subsequently upon shipment out of the mill point over the C. & G. Railway the C. & G. Railway Company refunds to the shipper the difference between the local rate inbound and the rate prescribed in tariff No. 81, depending upon

the length of the inbound movement. This tariff is applied on all inbound movements by rail, whether such transportation is performed by the C. & G. Railway Company or any other carrier serving the mill point. The line of the C. & G. Railway Co. lies wholly within the state of Mississippi. Movement of cottonseed products from any of the mill points on its lines to points outside of the state of Mississippi involves movement over the line of the C. & G. Railway and the connecting carrier. The C. & G. Railway Co. has joint rates on cottonseed products in effect from origin on its line to destination reached by connecting carriers, and such joint rates are properly concurred in by all participating carriers.

The report of the Commission shows that the investigation was instituted upon its own motion concerning the lawfulness of the rates. The St. Louis-San Francisco Railway Co. and the I. C. Railway Co., competitors of the C. & G. Railway Co., intervened in the hearing. Each of these interveners has a tariff substantially identical with the tariff of plaintiff, except that the tariff of each of these provides for a cut-back only upon cottonseed products processed from cottonseed originating inbound on the lines of such carrier. The rates for the inbound movements of cottonseed are published in tariffs local or joint governing the movement to the mill point. The rates on cottonseed products from the mill point are published in tariffs local or joint governing the movement from the mill point.

It is the contention of the plaintiff that the rate provided in the tariff is reasonable, just, not discriminatory, and that it is necessary in order to meet the competition of the trunk line carriers, and that the amount of freight paid by the shipper when moving outbound products over plaintiff's line is identically the same as it would be if the products moved out over its competitors' lines; that unless this tariff is permitted to stand, plaintiff, of course, is unable to meet the rate in effect by its competitors; that the processed products of the cottonseed become free freight at the mill points and that plaintiff is entitled to compete for free freight upon substantially equal terms with its competitors. That tariff No. 81 is not a joint tariff.

Interveners object to the tariff upon the theory that it attempts to name rates for account of their lines without their concurrence. That (1) their tariffs apply solely on shipments of cottonseed which they transport over their lines to the mill point; (2) to permit plaintiff's tariff to remain would in effect permit it to charge a less rate than that shown by its joint tariff and without concurrence of those carriers concurring in the joint rate.

The testimony shows without dispute that this tariff is profitable to plaintiff; that by its provisions and enforcement none of the capital investment of plaintiff is impaired; that the connecting carriers receive the entire proceeds from the rates as published applicable to them; and that plaintiff absorbs the entire amount of this cut-back. The testimony shows too that it does not vary in any respect whatsoever from the published tariff.

The tariff sets up a procedure by which the shippers of the outbound products are required to file through the claim channels of plaintiff the original bill of lading upon the inbound cottonseed within fifteen months and that then, in accordance with this tariff, the refund is made. The Commission did not find that the tariff was unreasonable, unjust or discriminatory, but determined that the form and manner in which the tariff is published does not conform to the requirements of Section 6(4) and 6(7) of the Act, and that it was unlawful by virtue of Section 1(6) of the Act. The Commission was without power to declare the tariff unlawful unless it found from the evidence as a fact that the tariff was in violation of 6(4) or 6(7) or otherwise violated 1(6).

The court is without power to review the Commission's conclusions of fact. Interstate Commerce Commission v. Delaware, etc., Railway, 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448. The legal effect of evidence, however, is a question of law, and when there is no dispute in the facts, the matter is then to be determined by the court as a matter of law. Interstate Commerce Commission v. Louisville & N. Railway Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; United States v. Chicago, M., St. Paul & Pacific Ry. et al., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023. The carrier retains the primary right to make rates but if after a hearing they are shown to be unreasonable, it is then the duty of the Commission to set them aside and require the substitution of just for unjust rates. Interstate Commerce Commission v. Louisville & N. Ry. Co., supra.

■ The purposes of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., are clearly stated in Interstate Commerce Commission v. Baltimore & O. Railway Co., 145 U.S. 263, 265, 12 S.Ct. 844, 36 L.Ed. 699. Among others mentioned, one of the purposes was to prohibit unjust discrimination in the rendition of like service under similar circumstances and conditions, and to prevent undue or unreasonable preference to persons or localities, but that it was not designed to prevent competition between different roads, and that it was not all discriminations or preferences that fall within the inhibition of the statute, only such as are unjust or unreasonable.

■ The freight that was sought to be captured by plaintiff's tariff was free freight and plaintiff, by any lawful means, had the right to endeavor to receive it. Atchison, T. & S. F. Ry. Co. v. United States, 279 U.S. 768, 49 S.Ct. 494, 73 L.Ed. 947. Under this authority the competitors of plaintiff had no more right to recapture the freight because they brought the cottonseed· in than does plaintiff have the equal right to compete for it upon equal terms. The shipper is entitled to a free choice of carriers upon substantially the same terms. In Texas & P. Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 674, 40 L.Ed. 940, the court stated: "The traffic thus secured was remunerative to the railway company, and was obviously beneficial to the consumers at the places of destination, who were those enabled to get their goods at lower rates than would prevail if this custom of through rates was destroyed. * * * the commission did not charge or find that the local rates charged by the defendant company were unreasonable. * * * The very terms of the statute, that charges must be 'reasonable,' that discrimination must not be 'unjust,' and that preference or advantage to any particular person, firm, corporation, or locality must not be 'undue' or 'unreasonable,' necessarily implied that strict uniformity is not to be enforced, but that all circumstances and conditions which reasonable men would regard as affecting the welfare of the carrying companies, and of the producers, shippers, and consumers, should be considered by a tribunal appointed to carry into effect and enforce the provisions of the act." Carriers have a right to initiate rates as long as they do not violate the terms of the Act. The Act itself leaves common carriers as they were at the common law. They may make special rates looking to the increase of their business, as long as they publish and file their rates and otherwise conform to the Act of Congress. Interstate Commerce Commission v. Chicago G. W. Ry. Co. et al., 209 U.S. 108, 28 S.Ct. 493, 52 L.Ed. 705; United States et al. v. Illinois C. Ry. Co. et al., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417; United States et al. v. Chicago, M., St. Paul & Pacific Ry. Co. et al., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023. The plaintiff, by publishing the condemned tariff, was not seeking any advantage. It was only seeking equality in order that the shipper might have a choice of routes to be determined by him upon a substantial equality. His good faith in this respect was not questioned. His motive was pure. Without this tariff his right to compete for this outbound freight is destroyed. "The theory of the act is that the carriers in initiating rates may adjust them to competitive conditions, and that such action ·does not amount to undue discrimination." Texas & P. R. Co. v. United States, 289 U.S. 627, 53 S.Ct. 768, 771, 77 L.Ed. 1410. The report of the Commission states: "The purpose of making the refund is to enable it to compete for traffic that might otherwise move outbound over the lines that originated the seed. The originating lines hold themselves out to cut-back their local inbound rates on the seed which they originate in order to induce the shipper to move outbound products over their lines. If it were not for the cut-back rates on the connecting lines, there would be no necessity for respondent's tariff, as the inbound shipments move from origin points to the mills at the local rates under separate bills of lading." The report states further that the refunds or cut-back are exactly the same in amount as those of the other carriers serving the mill points. The report further states that the legality of the interveners' tariffs is not in issue.

■ We think the legality of the interveners' tariffs, while not necessarily in issue, is very material to a correct solution of the validity of the plaintiff's tariffs. The legality of interveners' tariffs is not questioned by anyone and it is assumed that they are valid until declared invalid. They have been in existence since 1931 and were adopted by the competitors for the

purpose of meeting truck competition, as is shown by the report of the Commission, Division 3, in Docket No. 4599, I. & S. D. No. 459.

A clear analysis of plaintiff's tariff demonstrates that it in no wise affects the amount of the rates paid for the inbound service to the mill point. It does not affect the outbound rate of connecting carriers. But the refund is absorbed entirely by the plaintiff. There is no other carrier a party to plaintiff's condemned tariff. The tariff, in substance, is essentially the same as that of the intervening trunk lines, and if it were not for those tariffs of the intervening trunk lines, then there would be no necessity for the plaintiff's tariff, and probably it never would have been promulgated.

 Shippers pay the full amount of freight as published on the inbound movements over any of the roads. Likewise on the outbound movements the full amount of freight is paid and by the terms of the tariff is in no way affected. The effect of the condemned tariff is that when the processed products are shipped over C. & G.'s road, it will absorb a part of the inbound freight charges as published by its tariff, upon compliance with the procedure therein obtained. The plaintiff is therefore entitled to the relief sought.