GREAT NORTHERN RY. CO. v. COMMODITY CREDIT CORPORATION.

MINNEAPOLIS, ST. P. & S. S. M. R. CO. v. SAME.

NORTHERN PAC. RY. CO. v. SAME.

Civ. Nos. 1577-1579.

District Court, D. Minnesota,
Fourth Division.

April 26, 1948.

R. J. Hagman and J. H. Mulally, both of St. Paul, Minn., for plaintiff Great Northern Ry. Co.

A. O. Bjorklund and J. L. Hetland, both of Minneapolis, Minn., for plaintiff Minneapolis, St. Paul & Sault Ste. Marie Ry. Co.

L. B. daPonte and D. R. Frost, both of St. Paul, Minn., for plaintiff Northern Pac. Ry. Co.

Victor E. Anderson, U. S. Atty., and John W. Graff, Asst. U. S. Atty., both of St. Paul, Minn., for defendant Commodity Credit Corporation.

JOYCE, District Judge.

The three above entitled causes were consolidated for trial and were tried by the Court without a jury.

Commencing in the fall of 1943, the Commodity Credit Corporation,[1] hereinafter referred to as "Commodity" made a series of carload shipments of wheat [2] from Duluth, Minnesota and Superior, Wisconsin to points in Alabama, Florida, Georgia, Kentucky, North Carolina, South Carolina, and Tennessee. The plaintiffs in these actions, hereinafter referred to as the "carriers" were the originating carriers of these shipments of wheat. The shipments were prepaid from Duluth and Superior to the destinations named in the bills of lading. There is no question as to the amount of

---

[1] The Commodity Credit Corporation is a government corporation created under the laws of the State of Delaware pursuant to Section 2(a) of the Act of June 16, 1933, 48 Stat. 195, and Executive Order No. 6340, dated October 16, 1933. That it is an agency of the United States is apparent from a series of legislative acts. See Act of January 31, 1935, 49 Stat. 4, § 7, Act of January 26, 1937, 50 Stat. 5, § 2(a), Act of March 4, 1939, 53 Stat. 510, Act of July 1, 1941, 55 Stat. 498, Act of July 16, 1943, 57 Stat. 566,

Act of December 23, 1943, 57 Stat. 643, Act of February 28, 1944, 58 Stat. 105, Act of April 12, 1945, 59 Stat. 51, § 5, and Act of June 30, 1947, Public Law No. 130, Chap. 164, 15 U.S.C.A. § 713.

[2] Commodity was engaged, commencing in 1943, in purchasing wheat and furnishing it to deficit areas to provide additional supplies of feed for the production of livestock and poultry as a part of the Government's so-called "Feed Wheat Program".

the rate for the first portion [3] of the transportation but there is a question concerning the rate for the last portion [4] of the transportation. Prepayment of the shipments was on the basis of proportional rates for the second portion of the transportation. The carriers seek the recovery of undercharges contending that local rates are applicable for the second portion of the transportation. Commodity contends that proportional rates are applicable for the second portion of the transportation. Commodity further contends that it has overpaid the Great Northern and Northern Pacific Railway Companies and has counterclaimed for the amount of such excess payments. Commodity admits that it is indebted to the Minneapolis, St. Paul & Sault Ste. Marie Railroad Company but contends that such indebtedness is to be computed on the basis of proportional rates for the second portion of the transportation. The ultimate question in all three cases is whether under the applicable tariffs proportional rates are applicable for the last portion of the transportation, i. e. the transportation beyond the so-called river crossings.

Commodity purchased this wheat from certain grain companies f. o. b. Duluth and Superior. Prior to the shipments herein the grain companies received and unloaded wheat into their elevators at Duluth and Superior which had been transported by steamers [5] from Canadian ports across Lake Superior. Arrangements for the acquisition of the grain transported by steamers, the chartering of the steamers and the unloading into elevators at Duluth and Superior were under the exclusive supervision and control of the grain companies and neither the carriers herein nor Commodity [6] had any part in such arrangements, chartering or unloading. Between August 16, 1943 and January 22, 1944 the grain companies loaded from their elevators into freight cars of the carriers at Duluth and Superior the carloads of wheat involved in these suits. There was no competent proof adduced at the trial that the wheat thus loaded into the freight cars of the carriers was the same wheat that had been previously transported across Lake Superior by the steamers. The carriers and their connecting carriers transported the wheat to the destinations named in the bills of lading.

Prior to the loading of the wheat into the freight cars of the carriers, the grain companies filed with the Western Weighing and Inspection Bureau, hereinafter referred to as the "Bureau" [7] at Duluth and Superior so-called unload notices. These unload notices stated in effect that there had been unloaded into certain elevators on a certain day an amount of wheat which had been received from a named steamer. Upon receipt of a so-called unload notice, the Bureau would issue a form [8] reflecting the date of unloading, the number of bushels unloaded and the steamer from which it was unloaded, which form would be issued to the grain company which had filed the unload notice. After the freight cars of the carriers were loaded, the grain com-

---

[3] The first portion of the transportation is from Duluth and Superior to such river crossing points as Cairo, Ill., East St. Louis, Ill., Metropolis, Ill., Brookpoint, Ill., Evansville, Ind., Jeffersonville, Ind., New Albany, Ind., Henderson, Ky., Paducah, Ky., Louisville, Ky., Newport Ky., Covington Ky., St. Louis, Missouri, and Cincinnati, Ohio.

[4] The last portion of the transportation is from one of the so-called river crossing points to the destination named in the bill of lading.

[5] These steamers were contract carriers customarily engaged in transporting grain across Lake Superior.

[6] There was some evidence that Commodity was authorized and did issue certificates of exemption so that the grain brought in was free from the payment of import duty.

[7] The Western Weighing and Inspection Bureau is an organization maintained and controlled by a group of Western carriers, including the carriers herein. It is a policing organization of all the Western carriers and acts as an agent for such carriers in the conduct of their business. So far as is here pertinent the work of the Western Weighing and Inspection Bureau consisted of the filing of documents such as unload notices, the handling of transit and reshipping documents, maintenance of records, issuance of bills of lading and duties of a similar nature.

[8] Bureau form C.S. 13-3 entitled "Reshipping Memorandum and Credit Slip".

panies prepared and presented to the Bureau for issuance, bills of lading covering the freight cars which had been loaded and the Bureau issued the bills of lading.[9] Upon the face of each bill of lading was the notation "ex S.S." followed by the name of a steamer.

The tariff applicable to the shipments from Duluth and Superior to the so-called river crossings is Western Trunk Lines Freight Tariff No. 332-C. effective January 15, 1943, and Supplement 13 thereto, effective August 1, 1943, issued by L. E. Kipp, Agent, and hereinafter referred to as the "Kipp Tariff". The Kipp Tariff, Item 25-B, Section 1, (c) reads in part as follows:

ations named in the tariff. Note 1 and Note 5 referred to read as follows:

"Note 1.—Apply same proportional rates as shown herein from Duluth, Minn. to destinations shown in this item.

"Note 5.—Apply same proportional rates as shown in tariff, from Superior, Wis., to destinations shown in this Item."

The tariffs applicable to the shipments from the so-called river crossings to the destinations named in the bills of lading are Southeastern and Carolina Grain Tariff, Southern Freight Tariff Bureau, Freight Tariff 94-R, effective August 2, 1943, and Supplement 6 thereto, effective September 15, 1943, issued by R. H. Hoke,

"Application of Proportional Rates

"Ex-Lake Shipments from Chicago, Ill., Duluth, Minn., Green Bay, Wis., Itasca, Wis., Manitowoc, Wis., Milwaukee, Wis., or Superior, Wis. to destination territory described in Items 30 and 35.

"(c) On shipments of Ex-lake whole grain, flaxseed and/or screenings which arrive at Chicago, Ill., Duluth, Minn., Green Bay, Wis., Itasca, Wis., Manitowoc, Wis., Milwaukee, Wis. or Superior, Wis., by boat, shippers must certify that shipments were received by boat, and surrender of inbound freight bills will not be required.

"The rates on Ex-lake whole grain, flaxseed and/or screenings to destination territory described in Items 30 and 35 will be those in effect on the date shipment is tendered the rail carriers for shipment from Chicago, Ill., Duluth, Minn., Green Bay, Wis., Itasca, Wis., Manitowoc, Wis., Milwaukee, Wis. or Superior, Wis."

The Kipp Tariff, Item 30, reads in part as follows:

"Application of Ex-Lake rates from Duluth Minn., Itasca, Superior or Superior (East End), Wis. (See Item 25).

"Proportional rates named in tariff will also apply on Ex-Lake Traffic from stations shown below to destinations provided below, subject to the provisions of Notes 1 and 5, Page 39."

The stations shown in item 30 include Duluth, Minnesota and Superior, Wisconsin while the destinations are all destin-

and Mississippi Valley Grain Tariff, Southern Freight Tariff Bureau, Freight Tariff 133-J, effective September 15, 1942, and

---

[9] Commodity had previously furnished the grain companies with information of the amount of grain to be loaded and the

consignees and destinations of the shipments.

Supplement 14 thereto, effective August 12, 1943, issued by R. H. Hoke which tariffs are hereinafter referred to as the "Hoke" tariffs. While the different applicable items of the Hoke tariffs refer to different crossing points, the text giving rise to this litigation is the same in the Hoke tariffs. This item [10] reads in part as follows:

"b—Proportional or Reshipping Rates
Rates making reference to this item apply only as proportional or reshipping rates and in the manner described below:

1. (a) On shipments originating at points named in Paragraph (d) and moving via rail through the proportional or reshipping rate points listed in Paragraph 2, not stopped for transit at such points. (Subject to Paragraphs 3 and 4.)

 (b) On shipments originating at points named in Paragraph (d) and moving via rail to the proportional or reshipping rate points listed in Paragraph 2, accorded milling, malting or reshipping in transit privileges at such points under the rules named in agency or individual lines tariffs lawfully on file with the Interstate Commerce Commission. (Subject to Paragraphs 3 and 4.)

 (c) On shipments originating at points named in Paragraph (d) and moving via rail through the proportional or reshipping rate points listed in Paragraph 2, accorded milling, malting or reshipping in transit privileges at other points enroute where specifically authorized in agency or individual lines tariffs lawfully on file with the Interstate Commerce Commission. (Subject to Paragraphs 3 and 4.).

 (d) Proportional or reshipping rates referred to in Paragraphs (a), (b) and (c) of this item apply only on traffic originating at points in:
 Canadian Provinces,
 viz:
 Alberta
 Manitoba
 Saskatchewan

or in the States of:
 Arizona
 Arkansas
 California
 Colorado
 Idaho
 Illinois
 Iowa
 Kansas
 Louisiana (west
 of the Missis-
 sippi River)
 Michigan (up-
 per Peninsula)
 Minnesota
 Missouri
 Montana
 Nebraska
 Nevada
 New Mexico
 North Dakota
 Oklahoma
 Oregon
 South Dakota
 Texas
 Utah
 Washington
 Wisconsin
 Wyoming

b—Proportional or Reshipping Rates

2. The proportional or reshipping rates named are applicable only from the following points, and only to the extent that proportional rates are named from such points individually:

 Brookport, Ill. Metropolis, Ill.
 Cairo, Ill. Paducah, Ky.
 East St. Louis, Ill. St. Louis, Mo.

 including all industries located within the switching districts of such points, as provided in individual or agency Switching and Absorptions tariffs lawfully on file with the Interstate Commerce Commission and will not apply from those points proper, or other points taking same rates.

3. These rates are applicable only to shipments upon which the charges are applied from points of origin to proportional or reshipping rate points as follows:

 (a) On traffic which is interstate from point of origin to final destination, the interstate rates as per tariffs lawfully on file with the Interstate Commerce Commission.

 (b) On traffic which is intrastate from points of origin to final destination, intrastate rates lawfully applicable.

---

[10] The item reproduced is item 36–A of Supplement 14 to Tariff 133–J.

The words "points of origin" used in this tariff, are understood to mean the point from which local (flat, not proportional or reshipping) rate has been applied. A rate local at shipping point and proportional or reshipping at destination will be treated as a local rate as determining point of origin."

Both the carriers and Commodity agree that Commodity is entitled to the rate specified in Section 25 of the Kipp tariff for the transportation from Duluth and Superior to the so-called river crossings. However, in applying the Hoke tariff for the last part of the transportation they are in disagreement and that disagreement stems from the definition of point of origin in the Hoke tariff. That definition makes the point of origin the point at which the local or flat rate has been applied. The carriers contend that the rate in Section 25 of the Kipp Tariff is a proportional rate and hence Duluth and Superior could not be the points of origin of the shipments. Commodity contends that Duluth and Superior are the origin points of the shipments and hence the rate in Section 25 of the Kipp Tariff is not proportional. The carriers contend that the billing arrangements at the Bureau were transit arrangements and the transportation from Duluth and Superior to the so-called river crossings were transit shipments and hence the rate for such transportation was proportional. Commodity contends that the billing arrangements at the Bureau were not transit arrangements and that the transportation from Duluth and Superior to the so-called river crossings were not transit shipments and hence the rate for that transportation was not proportional. There appears to be no disagreement between the parties that if the rate in Section 25 of the Kipp Tariff is proportional that Commodity must pay local rates beyond the so-called river crossings; and that if this rate is not proportional then Commodity need pay only proportional rates beyond the so-called river crossings.

Before attempting to resolve these conflicting positions it appears appropriate to consider applicable rules of tariff construction, the nature of proportional rates and transit privileges. Unless and until suspended or set aside, the published rate is for all purposes the legal rate as between carrier and shipper. Keogh v. Chicago N. W. R. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183. The construction that shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute. Great Northern R. Co. v. Merchants' Elev. Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943. In construing a railroad tariff, the entire instrument must be visualized and effect must be given to every word, clause, and sentence. Van Dusen Harrington v. Northern Pacific Ry. Co., 8 Cir., 32 F.2d 466. General and specific provisions of a tariff in apparent contradiction may subsist together, the specific qualifying and supplying exceptions to the general. Pillsbury Flour Mills. v. Great Northern Ry. Co., 8 Cir., 25 F.2d 66.

Tariffs, like statutes, have the force of law; like statutes they must be expressed in clear and plain terms so that those dealing with and governed by them may understand them and act advisedly. Atlantic Coast Line R. Co. v. Atlantic Bridge Co., 5 Cir., 57 F.2d 654. Since the tariff is written by the carrier, all ambiguities or reasonable doubts as to its meaning must be resolved against the carrier. Union Wire Rope Corporation v. Atchison T. & S. F. Ry. Co., 8 Cir., 66 F.2d 965.

In Grain and Grain Products Within Western District, 164 I.C.C. 619, the Commission defined flat and proportional rates as follows at page 633:

"A flat rate is either a local rate of a single carrier or a joint rate of two or more carriers published as a unit and not dependent for application on any previous or subsequent transportation.

"A proportional rate is a local or joint rate dependent for application upon (1) a previous transportation to the point from which the proportional rate applies; (2) a subsequent transportation from the "point to which the proportional rate applies; (3) or both. It is supposed to be a part of a through rate and is usually lower than the

flat rate between the same points. When dependent upon previous inbound transportation it is applicable only upon surrender of the inbound paid freight bill showing the transportation of the shipment inbound. The freight bill need cover only an equivalent inbound tonnage, as preservation of identity grain is not required."

In Hocking Valley R. Co. v. Lackawanna Coal & Lumber Co., 4 Cir., 224 F. 930, at page 931, the Court defined [11] a proportional rate as follows: "A 'proportional rate' as the term implies, is simply a part of a through rate. It is the share of the aggregate charge from origin to destination which one or more of the carriers accepts for performing a definite portion of the whole transportation service."

Transit was defined in Baltimore & O. R. Co. v. United States, 24 F.Supp. 734, 735, (District Court, New York) [12] as follows: "A 'transit' is a stop-over privilege granted by a carrier, by which a break de facto in the continuity of carriage of goods is disregarded, and two legs of a journey are treated as though they were covered without interruption: It unites both legs into a 'through route', for which a joint rate can be published."

The Interstate Commerce Commission has regarded transit as a privilege granted by a carrier under specified conditions and unless the carrier's conditions are met, a carrier may not grant and a shipper is not eligible for the transit privilege. In The Matter of the Substitution of Tonnage at Transit Points, 18 I.C.C. 280, The Transit Case, 24 I.C.C. 310. While transit may unite different parts of a carriage that would otherwise be separate and distinct there can also be breaks in carriage which no transit can bridge. Baltimore & O. R. Co. v. United States, supra. Transit privileges rest upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination. Central R. Co. of New Jersey v. United States, 257 U.S. 247, 42 S. Ct. 80, 66 L.Ed. 217. Where the inbound and outbound movements are wholly independent and distinct no fiction can convert them legally into a continuous or through movement. Atchison, T. & S. F. Ry. Co. v. United States, supra. The parties hereto are in agreement that if the grain was the subject of transit they are governed by the transit tariff.[13]

In the ordinary and natural meaning, the phrase "point of origin" as applied to a tariff would appear to refer to the point indicated as such on the bill of lading. In these cases the bills of lading all recite on their face that the carriers received the grain on a certain date at Duluth or Superior. Where there is no through bill of lading a carrier receiving goods cannot for rate purposes look back to any prior shipments. Bigbee & Warrior Rivers Packet Co. v. Mobile & O. R. Co., C.C., 60 F. 545. When goods are reshipped from a transit point, the bill of lading refers back to the date of the original shipment, the place at which the original shipment was made, and the charges paid from the place of the original shipment to the transit point. In these cases the only reference to a point of origin on the bills of lading was Duluth or Superior. The notation on the bills of lading naming a certain steamer could only designate that the shipments are of a certain character and as such entitled to certain rates; such notation does not purport to give information making the shipment like the ordinary case of reshipped grain where all the details of a prior shipment are recited.

While ordinarily the point of origin would be the place from which the

---

[11] This definition appears to have the approval of our Supreme Court. See Atchison, T. & S. F. Ry. Co. v. United States, 279 U.S. 768, 771, 49 S.Ct. 494, 73 L.Ed. 947 and I. C. C. v. Inland Waterways Corporation, 319 U.S. 671, 694, 63 S.Ct. 1296, 87 L.Ed. 1655.

[12] This was a statutory three judge court case in which the opinion is written by Circuit Judge Learned Hand.

[13] This tariff hereinafter referred to as the "transit tariff" is Western Trunk Lines Freight Tariff No. 331–J, entitled "Transit Rules and Regulations", effective March 1, 1943.

shipments were made, it is clear that the phrase "point of origin" does not retain its ordinary meaning when expressly defined otherwise in the tariff. Updike Grain Co. v. Chicago & N. W. R. Co., 8 Cir., 35 F.2d 486. The Hoke tariffs define "point of origin" as follows: "The words 'points of origin' used in this tariff, are understood to mean the point from which local (flat, not proportional or reshipping) rate has been applied. A rate local at shipping point and proportional or reshipping at destination will be treated as a local rate as determining point of origin."

Application of this tariff definition is not as easy as its recital. Under this definition there must first be determined the point at which the local rate was applied and that point becomes the tariff point of origin. There is only one point at which a rate (for our purposes) was applied and that point was Duluth or Superior. If this rate is proportional, Duluth and Superior are not the points of origin, whereas if this rate is not proportional Duluth and Superior are the points of origin. Of course the scope of this inquiry is confined to the narrow question whether this rate is proportional or local for the purposes of the Hoke Tariffs.

One of the rules of tariff construction is that effect must be given to every word, clause, and sentence and accordingly effect must be given to the words "will also apply" in the Kipp Tariff. These words are indicative of the fact that the ex-lake rates are something different from the other rates treated in that portion of the tariff. The fact that the amount of the ex-lake rate is the same as the amount of the proportional rate is of no particular significance as one of the carrier's own experts admitted that there was no reason why, in principle, a local rate cannot be made the equivalent of a proportional rate. The language quoted suggests that the Kipp Tariff does that very thing in this instance. To construe it otherwise would fail to give effect to the language used and would do violence to the very language used.

A proportional rate has been authoritatively defined as a part of a through rate.

If the ex-lake rate from Duluth or Superior to the so-called river crossings is a proportional rate then there must be at least one other part of the rate that can readily be identified as such other part. One of the carrier's experts admitted that he did not know what the other part of the rate was while another of the carrier's experts stated there was no other part. A proportional rate has been authoritatively defined as dependent for application upon a previous transportation to the point from which the proportional rate applies, or a subsequent transportation from the point to which the proportional rate applies or both. A local or flat rate has been authoritatively defined as not dependent upon any previous or subsequent transportation. The transportation here is from Duluth or Superior to the so-called river crossings. If the rate for this transportation is proportional it must depend upon a previous transportation to Duluth or Superior. If the rate for this transportation is local or flat it does not depend upon any previous transportation. It has not been suggested that the ex-lake rate here depended upon any previous transportation to Duluth or Superior by any of the carriers herein or any other carriers who are parties to their tariffs. On the contrary, the first time the carriers herein or any other carriers who are parties to their tariffs had anything to do with the grain transported was at Duluth and Superior. The essence of the transactions was: When delivery of grain was made in the elevators at Duluth and Superior the shipment was local at those points and ended whatever contracts of transportation brought grain to Duluth and Superior; and when grain was loaded at Duluth and Superior into the freight cars of the carriers a new contract of transportation was made which was subject to the carriers' tariff at the time of such loading and not before.

It is not amiss to observe that even if the Kipp Tariff did call the ex-lake rate from Duluth and Superior a "proportional" rate, such designation would not be binding for as the Interstate Commerce Commission has pointed out a name given by a carrier to

a rate cannot determine the legal character of the rate. Gund & Co. v. C. B. & Q. R. R. Co., 18 I.C.C. 364; Kansas City Transportation Bureau v. A. T. & S. F. Ry. Co., 16 I.C.C. 195. And our Circuit Court of Appeals has also taken occasion to point out that a tariff naming a rate as proportional did so inaccurately. Wisconsin Central R. Co. v. United States, 8 Cir., 169 F. 76.

 In Great Northern R. Co. v. Sullivan, 294 U.S. 458, 460, 55 S.Ct. 472, 473, 79 L.Ed. 992 the Court said: "Each proportional necessarily was a part of the through rate and was capable of use only as such (citing cases). They show the basis of division of charges between connecting carriers and serve precisely as do agreed divisions of charges based on joint rates. A proportional differs from a local rate in that it covers only terminal service at place of receipt or at place of delivery but cannot, as does the local rate, cover both."

In the cases at bar the shipments out of Duluth and Superior would be entitled to terminal service at both ends and the language of the Sullivan case indicates that this fact alone would make the rate out of Duluth and Superior not proportional but local or flat.

 Were these shipments transited at Duluth and Superior? The rates out of Duluth and Superior could not be proportional unless the grain was transited at those points, and as the carriers concede, unless resort be had to the fiction of continuity, that is of a continuous through movement, there could have been no transit. Without there being transit it is manifest that wheat loaded into cars at Duluth or Superior, whether loaded out of an elevator or on a team track, could be shipped out only at the applicable local rate. The carriers cite Boone v. United States, 6 Cir., 109 F.2d 560 as holding that continuity has been found to exist on ex-barge shipments and hence it also exists on ex-lake shipments. The Boone case was a prosecution for the solicitation, acceptance, and receipt of rebates. Boone solicited and received a proportional rate on corn from Memphis which corn had been previously transported to Memphis by a barge line whose tariff was not on file with the Interstate Commerce Commission. The tariff under which Boone shipped from Memphis was one specifying that proportional rates were applicable when originating beyond certain points by rail or water or both under tariffs on file with the Interstate Commerce Commission. The amount of the rebate was the difference between the flat and the proportional rate. In sustaining the conviction the Court held that the flat rate was the one applicable to the shipments. The Boone case does hold that for a shipment to be transited it must comply with the transit tariff. In Baltimore & O. R. Co. v. United States, supra, the Court, in speaking of certain interruptions not breaking continuity said: "The reason why such interruptions are held not to break continuity is because of the intent of the parties at the outset to unite all parts of the carriage; and that intent—while not conclusive, because no one element is that—is probably the most important single determinant of continuous carriage, and therefore of 'through routes.'" No such intent at the outset to unite all parts of the carriage can be found here. The lake shipment was not under rates subject to the Interstate Commerce Act and in Kansas City Board of Trade v. A. T. & S. F. Ry., 69 I.C.C. 185 it was held this fact by itself breaks the continuity of the shipment. Commodity did no more than file the certificate required by the Kipp Tariff but did nothing that might be required by the transit tariff. The Interstate Commerce Commission has frequently reiterated the principle that reshipping rates under transit privileges must be governed by the tariffs in effect at the time of the inbound shipments and that inbound freight bills must be surrendered. In re Substitution of Tonnage at Transit Points, 18 I.C.C. 280; Transit Case, 24 I.C.C. 340; Transit Privileges on Grain, 62 I.C.C. 466; Kansas City Board of Trade v. A., T. & S. F. Ry., 69 I.C.C. 185. The Kipp Tariff provided on the contrary that the rate would be the rate on the date that shipment is tendered to the rail carrier and that surrender of inbound freight bills would not be required.

It seems obvious that these shipments were hot transited at Duluth or Superior.

It must be apparent from the foregoing discussion that the Court is of the opinion that the ex-lake rate from Duluth or Superior is not a proportional but is a local or flat rate. The rate being a flat or local rate, the point of origin for the purposes of the Hoke tariffs is Duluth or Superior.[14] Were this not the case one might inquire if under the tariff definition Duluth and Superior were not the points of origin where under the tariffs did the shipments originate since presumably for tariff purposes a shipment must originate somewhere. Under the holding herein Duluth or Superior was the point of origin under the tariff definition as well as the actual physical fact.

Commodity has urged that in the event the Court should hold it was not entitled to proportional rates beyond the so-called river crossings that it be permitted to substitute all rail billing for certain of the shipments. The right of substitution under certain conditions is found in item 40 of the Transit Tariff. This transit tariff has application primarily to transit shipments and item 40 pertains to substitution on transited shipments. As has been heretofore observed the Court is of the opinion that these shipments were not transited at Duluth or Superior and hence there can be no right to substitute all rail billing on these shipments under the Transit Tariff.

The parties hereto have stipulated that when the Court has determined how the tariffs are to be construed they will agree on the correct amount of the judgment in each case. A stipulation as to such amount should be filed in each case. When this is done Findings of Fact, Conclusions of Law and an Order for Judgment in favor of defendant will be filed in each of these three cases, and this memorandum opinion will be part thereof.

An exception is reserved to all parties.

[14] It is interesting to note that for the purpose of minimum weights, Item 75 of the Transit Tariff regards Duluth and Superior as the origin points on ex-lake grain.