## ST. PAUL ASSOCIATION OF COMMERCE AND ANOTHER v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY AND OTHERS.[1]

July 28, 1916.

Nos. 19,762—(9).

**Railroad and Warehouse Commission — fixing maximum rates — act of 1915 valid.**

1. Chapter 367, Laws 1915, does not violate the provisions of section 1, article 3, Constitution of Minnesota. It is not an attempt to delegate legislative power.

**Same — due process of law clauses not violated.**

2. The order of the Railroad and Warehouse Commission does not deprive appellants of their property without due process of law.

The St. Paul Association of Commerce petitioned the Railroad and Warehouse Commission of Minnesota to exercise the authority granted it under Laws 1915, c. 367, and to make an order to the common carriers doing business in Minnesota, requiring them to publish a rule which would group St. Paul, Minnesota Transfer and Minneapolis as one common point for rate-making purposes upon intrastate traffic. Nine railroad companies filed separate answers and several of them alleged

[1] Reported in 158 N. W. 982.

that Laws 1915, c. 367, was in conflict with section 1 of article 3 of the state Constitution and was therefore void. The Minneapolis Civic and Commerce Association petitioned the commission that under the provisions of chapter 367, Laws 1915, it issue an order requiring the carriers to publish, charge and collect rates from Hopkins and St. Louis Park adjacent to Minneapolis rates on intrastrate freight no higher than the rates which are published, charged and collected on the same kind of freight to and from that city. The matter was heard by the commission who directed the railroad companies to show cause why an order should not be made establishing St. Paul, Minnesota Transfer, Minneapolis, Hopkins and St. Louis Park as a common rate point and basing rates between such common rate point and other points in Minnesota upon the shortest mileage. After hearing by the commission the order was made permanent to take effect from January 1, 1916. From the order of the commission, ten railroad companies appealed to the district court for Ramsey county. The appeal was heard before Michael, J., who affirmed the order of the commission. The motion of the railroad companies for a new trial was denied. From the judgment entered pursuant to the order for judgment, they appealed. Affirmed.

*Barrows, Stewart & Ordway, Briggs, Thygeson & Everall, F. W. Root, Stringer & Seymour, J. B. Sheean, C. C. Wright, E. C. Lindley, M. L. Countryman, John F. Finerty, A. H. Bright, C. W. Bunn, Charles Donnelly* and *W. H. Bremner,* for appellants.

*Lyndon A. Smith,* Attorney General, *Rollin L. Smith,* Assistant Attorney General, *O'Brien, Young & Stone* and *T. A. McGrath,* for respondents.


SCHALLER, J.

The St. Paul Association of Commerce applied to the Railroad and Warehouse Commission of this state to make St. Paul, Minnesota Transfer and Minneapolis one common rate-making point. The Minneapolis Civic and Commerce Association also applied to the commission to have Hopkins and St. Louis Park included in the Minneapolis common rate point. The two cases were considered together and a tentative order was made by the commission granting the prayer of both petitioners. Thereafter, and on the hearing to make the tentative order final, certain

commercial interests of the city of South St. Paul, Dakota county, petitioned to have South St. Paul included in the common rate point on live stock rates, which was done.

From the final order made by the commission an appeal was taken to the district court of Ramsey county by the railroad companies and after a hearing on that appeal the court made its findings and affirmed the order of the Railroad and Warehouse Commission. A motion was made for a new trial which was denied and judgment entered. The railroad companies appeal from the judgment.

The complaints were duly made and filed with the commission. Each of the appellants duly appeared and answered. The matters involved in the complaints and answers were duly heard before the commission on August 2, 1915.

On August 12, 1915, the commission, pursuant to its announcement theretofore made, entered and served upon the appellant companies a tentative order establishing St. Paul, Minneapolis, Minnesota Transfer, Hopkins and St. Louis Park a common point, and directed the carriers to show cause why such tentative order should not be made final and effective. On the twenty-third of August, pursuant to such direction, all the parties appeared and were heard, and on the twenty-sixth of August, the commission made and entered its final order which incorporates Minneapolis, Hopkins, St. Louis Park, Minnesota Transfer, St. Paul and South St. Paul into a common rate point for certain classes of freight. The district court, on appeal from the final order, found that each and all the statements and recitals of fact made in the orders of August 12 and August 26, 1915, are true. The facts found by the commission and by the district court, which are sustained by the evidence produced before the commission and before the court, are substantially as follows:

St. Paul and Minneapolis, the two largest cities in Minnesota, contain a population of nearly 600,000. Nine of the largest railroad companies operating in the state of Minnesota furnish transportation to and from these cities. The cities adjoin and constitute one large commercial center. Both contain large wholesale and retail mercantile houses, manufacturing plants and industries which distribute their products and merchandise throughout Minnesota and the northwest.

For more than 25 years prior to January, 1914, appellants voluntarily

made identical freight rates on interstate traffic to and from these cities and made identical freight rates on merchandise, grain, live stock, lumber, stone and other articles transported between these cities and all other stations in the state. Such intrastate rates have been based either upon the shortest mileage between these cities and any other station in the state or they have been specific rates. Rates were in many cases based upon a zone plan which zone included considerable territory. Competing industries and mercantile houses located in the two cities must necessarily sell their products and merchandise to buyers in all parts of the state at approximately the same price, so that an increased freight charge made to one or the other of the cities must be assumed by the dealer or distributor in that city. This increased freight charge in no way benefits either the customer or the dealer.

Minnesota Transfer is a railway transfer station in the manufacturing and wholesale district, located largely in the city of St. Paul. It is a very considerable factor in the manufacturing and industrial life of these cities.

Hopkins, nearly four miles distant from the city limits of Minneapolis, is a manufacturing community which for many years has enjoyed the St. Paul and Minneapolis rates upon both state and interstate business. Carriers which did not reach Hopkins directly gave it the twin city rate and absorbed the switching charge. The factories at Hopkins are large buyers of raw material, and because they are in active competition with dealers and manufacturers in the cities, it is important that they should have the same freight rates.

St. Louis Park, a village of 2,200 people, is located about one and one-half miles from the city of Minneapolis. Its chief industry is a large manufacturing plant which is in active competition with dealers in agricultural machinery in the two cities, and it is important that the business and industries in St. Louis Park should be on a parity as to rates with those located within the boundaries of St. Paul and Minneapolis. For many years St. Louis Park and Hopkins have been treated by the carriers as part and parcel of the cities of St. Paul and Minneapolis.

South St. Paul, located in Dakota county, adjoins St. Paul on the south. The north boundary of the former city is the south boundary of the latter. The large industries of South St. Paul are packing, live stock

and stock yards. It contains a population of more than 5,000 people. It has always taken the St. Paul rates, and before January 1, 1914, the same rates were applied to both interstate and intrastate traffic to and from all the points mentioned, and during that time they were in fact a common rate point.

The practice of creating a common rate point has existed for many years in every part of the United States. The territory embraced within the Chicago, Illinois, common rate district is approximately 30 miles long and 15 miles wide. The territory included in the Kansas City district extends approximately ten miles from the eastern limits of Kansas City to a point in the state of Kansas ten miles from the western limits of Kansas City. The same situation exists at St. Louis, Missouri, and at practically every large railroad center in the United States. This practice has been known to and approved by the Interstate Commerce Commission and the courts. The fact that such common rate points exist and that they are as stated seems to be conceded.

After the passage by the legislature of 1913 of the distance tariff law, which went into effect on the first of January, 1914, the commission, pursuant to the provisions thereof, and after a full hearing, prescribed certain maximum freight rates to take effect January 1, 1914. The conclusion was arrived at that under the terms of the law, distance was the controlling factor, and consequently the carriers based their charge for transportation on actual distance on all traffic to and from each of the cities and villages above named. Consequently, goods from the west, southwest and northwest paid a higher rate to St. Paul and South St. Paul than to Minneapolis. The situation was reversed in case of shipments from the southeast, south of points east of St. Paul destined to Minneapolis, Hopkins or St. Louis Park. Between 80 and 90 per cent of the intrastate traffic came through Minneapolis, the balance through St. Paul. The result in every case was an advantage gained by one of the two cities on shipments to and from certain parts of the state, and a corresponding disadvantage to the other. An indirect consequence was injury to the commerce and industries of both cities, more serious to those of St. Paul. An attempt was made by business interests in St. Paul to equalize con-

ditions by absorbing the difference in the rates, but substantial loss was nevertheless inflicted upon the industries and commerce of that city. The same was true of Minneapolis, but in a much lesser degree.

The inequalities and burdens of this situation were recognized by both the carriers and the petitioners. The difficulty seems to have been that under the then state of the law no remedy could be devised. All parties seemed to think that a common rate point could not be retained without violating the distance tariff law. Laws 1913, p. 76, c. 90. This was the situation when the legislature of 1915 assembled. That legislature enacted chapter 367, p. 500, Laws 1915, entitled: "An act to amend section 4353 of the General Statutes of Minnesota for 1913 relating to railroads." Section 4353 is section 6 of chapter 90, p. 79, Laws 1913. This section, as amended, reads as follows:

"The Board of Railroad and Warehouse Commission of this state is hereby empowered and directed to make for each of the railroad corporations doing business in this state, as soon as practicable, a schedule of reasonable maximum rates of charges for the transportation of freight and cars on each of said railroads and said power to make schedule shall include the classification of such rates and it shall be the duty of said commission to make such classification and said schedules so made by said commission shall, in all suits brought against any such railroad corporation wherein is in any way involved the charges of any such railroad corporation for the transportation of any freight or cars or unjust discrimination in relation thereto, be deemed and taken in all the courts of this state as *prima facie* evidence that the rates therein fixed are reasonable and just maximum rates of charges. The commission may fix different schedules of class or commodity rates for railroads of the same class. The maximum rates shall not apply to switching or drayage rates. The commission may define switching and drayage service to apply to the movement of traffic within and between points, and fix reasonable maximum rates for the same, which shall be independent of any rates that may be made for line haul transportation, and in the making of said rates the commission shall not be governed entirely by the distance principle established in this act. The commission may fix rates for feeding cattle which shall apply to out movement from terminal markets. The commission may unite two or more stations or commercial

centers into a common rate point, and may designate the classes of freight which shall take common rates, and fix the mileage that shall govern between the common rate point and any or all other points in the state. The distances so fixed shall not apply as a measure of the rate for the movement of the same class of freight for similar distances between other points."

Chapter 367, p. 500, Laws 1915, was approved and went into effect April 24, 1915.

Thereafter the petitions first above mentioned were filed, proceedings had and the orders of the commission were made under and pursuant to the provisions of that amendment.

There are practically only two questions raised on this appeal: The amendment of 1915 is challenged on the ground that it is unconstitutional; (a) because it is an attempt to delegate legislative power in violation of section 1, article 3, of the Constitution of Minnesota; (b) because the commission's order deprives appellants of their property without due process of law.

1. It is axiomatic that an act of the legislature is presumed to be constitutional and valid, unless it is clearly shown that it violates some provision of the state or Federal Constitution. Appellants argue, among other things, that because the law does not declare when or under what circumstances two or more stations or commercial centers may be united into a common point, because the law does not say what classes of freight shall take a common rate, because the commission is left free to do as it sees fit, either to unite or refuse to unite communities into a common point and because the commission is not provided with or controlled by any standard, the law is not valid, citing, among other authorities, the case of State v. Great Northern Ry. Co. 100 Minin. 445, 111 N. W. 289, 10 L.R.A.(N.S.) 250.

The act might possibly be open to such criticism if it were original and independent legislation, but in terms it is an amendment of section 6, c. 90, p. 79, Laws 1913. The latter act is a complete and comprehensive expression of the legislative will. The act of 1915 becomes merely a part thereof, and the whole law as amended must be read as one act, just as the legislature intended that it should be. So reading the law we find that railroad freight rates must be based upon distance and that as

an exception to this rule the commission may in making or adjusting tariffs unite several communities into a common point, regardless of distance.

It is no longer open to question that the Railroad and Warehouse Commission has the power to ascertain and determine what are reasonable and just rates. State v. Chicago, M. & St. P. Ry. Co. 130 Minn. 144, 148, 153 N. W. 320, L.R.A. 1916B, 764. Nor is there any doubt that in practice railroads have established and united communities in common points for rate making purposes. See Hammerschmidt & Franzen Co. v. Chicago & N. W. Ry. Co. 30 I. C. C. Reports, 71; Intermountain Rate Cases, 234 U. S. 476, 34 Sup. Ct. 986, 58 L. ed. 1408. It would probably not be disputed that if such power had heretofore been exercised by the carriers themselves in such a way as to give rise to unreasonable and unjust discrimination against other communities the Railroad and Warehouse Commission had the power to correct any such abuse. The power to unite communities into common rate points or to make common rates is incident to the rate making power. It grows out of "commercial necessity" (see State v. Minneapolis & St. L. R. Co. 80 Minn. 191, 83 N. W. 60, 89 Am. St. 514), and is exercised to prevent injury and discrimination. Being incident to the rate making power, it may be delegated to the commission, just as the power itself is delegated, and such delegation is not unlawful. The power may be lawfully exercised so long as the result is not unreasonable or unjust and so long as its effect on the carriers' earnings does not amount to confiscation.

It is conceded that the power of uniting several communities into a common point for rate making purposes was in the first instance exercised by the carriers themselves. If the act of 1913 had expressly authorized the carriers to create common rate points regardless of distance, or to continue the common rate points in existence before the act went into effect, the legislature could not have been accused of transcending its power. It has not done so by permitting the commission to make common rate points regardless of the general rule provided by statute.

The act of 1915 is not open to the objections made by the appellants. State v. Great Northern Ry. Co. 100 Minn. 445, 111 N. W. 289, 10 L.R.A.(N.S.) 250, is not in point.

2. It is contended that the commission's order deprives the appellants

of their property without due process of law, in violation of the Four-teenth amendment to the Constitution of the United States.

It is not necessary in considering this phase of the question to enter into any long discussion as to what is or what is not due process of law. The proceedings were initiated by complaint made by persons interested as provided by statute; the carriers were cited to appear before the commission and answer, which they did; a hearing was had before the commission; evidence was taken; arguments heard, and a fair and full opportunity given to each of the appellants to present its case. A tentative order was made and another opportunity given to all the parties to present any further testimony and arguments which they might have, which opportunity was taken advantage of by all the appellants.

They appealed to the district court and again a hearing was had at which appellants introduced further evidence, and all the contentions of the parties were heard and tried *de novo*. Thereupon the district court affirmed the order of the commission.

A mere recital of the facts would seem sufficient to determine that there was due process of law. The result may be a diminution to some extent of the carriers' revenue, but that is incidental and concededly does not amount to confiscation. It is not altogether clear from the findings herein that there will be any great or even appreciable loss of revenue. But the result of a proceeding does not constitute the test whether the proceeding itself is due process of law.

The order of the commission would practically restore the conditions which existed prior to January 1, 1914. The rates are approximately the same and the common point is approximately the same. If by reason of the enactment of chapter 90, p. 76, Laws 1913, the carriers obtained a greater revenue, that result grew out of the interpretation which they themselves put upon the distance tariff act.

As to whether their interpretation was the correct one, we are not called upon to decide. However, the mere fact that revenues will probably be reduced is not decisive. The rates fixed by the commission, pursuant to chapter 90, p. 76, Laws 1913, were the reasonable maximum rates. A rate may be just and reasonable even though it is not a maximum rate.

The consensus of opinion among all the parties litigant seems to be
134 M.—15.

that it is desirable to have a common rate point, but the carriers protest that it should be some central point rather than territory within certain boundaries. The result of the arrangement desired by the carriers would be to increase, rather than decrease, the earnings of the carriers, and the commission so finds. The legislature in enacting the amendment of 1915 intended no such result. They were fully aware of the situation and knew that common rate making points were actually in existence elsewhere. They knew that these cities were a common rate point in interstate commerce, and intended to provide a means by which intrastate commerce could enjoy the same advantages. Minnesota legislatures have never shown a disposition to impose new burdens on the shipper. The legislature of 1915 did not differ from any of its predecessors in this respect.

Judgment affirmed.