# HARRISON ENGINEERING & CONSTRUCTION CORPORATION v. ATCHISON, T. & S. F. RY. CO.

# L. V. HITES CO. v. ATCHISON, T. & S. F. RY. CO.

Nos. 4084, 4085.

District Court, W. D. Missouri, W. D.

Aug. 5, 1948.

908

Richard C. Southall, of Kansas City, Mo., for plaintiffs.

John Lathrop and Henry W. Fox, both of Kansas City, Mo., for defendant.

RIDGE, District Judge.

Plaintiffs in these consolidated actions seek recovery of alleged freight rate overcharges exacted by defendant for certain shipments of sand, gravel, crushed stone and mixed aggregate of sand and gravel. The basis upon which such claims are asserted is that the weight on which the freight rates charged by defendant was calculated for said shipments was not connected with any applicable provisions of governing tariffs; that a three percent (3%) Federal tax collected by defendant upon the amounts paid for such shipments was unlawfully collected in violation of the Federal Constitution; and that certain switching and distance charges exacted by defendant on a portion of such shipments were unauthorized.

The claims so made in the Harrison case are in five counts. The first count in that case involves six (6) shipments of sand from Lawrence to Cherryvale, in the State of Kansas, between November 14, 1941, and December 27, 1941, and a claimed weight overcharge of $112.22; the second count concerns five (5) shipments of sand, between September 22, 1941, and September 27, 1941, from Topeka to Cherryvale, Kansas, and a weight overcharge of $97.17; the third count involves crushed rock shipped from Garnett to Hutchinson, Kansas, and a weight overcharge of $1,410.82 and transportation tax amounting to $104.86; the fourth count is for 199 shipments of crushed stone from Moline, to Hutchinson, Kansas, and a weight overcharge of $3,608.22 and transportation tax of $332.73; the fifth count concerns 246 shipments of aggregate and sand from Sterling to Hutchinson, Kansas, and a claimed weight overcharge in rates of $1,492.38 and transportation tax amounting to $121.44.

The Hites case involves seven (7) claims for overcharges, as follows: (1) 14 shipments of gravel from Holliday to DeSoto, Kansas, on which a weight overcharge of $43.40, a rate overcharge of $36.38, and a transportation tax overcharge of $7.63 are claimed; (2) 83 shipments of crushed rock from Holliday to DeSoto, Kansas, a weight overcharge of $498.82, a rate overcharge of $223.64, and transportation tax overcharge of $46.53; (3) 24 shipments of crushed rock from Morris to DeSoto, Kansas, a weight overcharge of $76.73, rate overcharge of $71.29, transportation tax overcharge of $15.12; (4) 26 shipments of sand from Topeka to DeSoto, Kansas, a weight overcharge of $258.57, a rate overcharge of $71.29, a transportation tax overcharge of $42.08; (5) 101 shipments of crushed rock from Pixley, Missouri, to Pauline, Kansas, a weight overcharge of $476.35, and rate overcharge of $677.28;

(6) 297 shipments of crushed rock from Morris to Pauline, Kansas, a weight overcharge of $1,734.63, a rate overcharge of $1,677.68, a transportation tax overcharge of $339.99; (7) 203 shipments of sand from Topeka to Pauline, Kansas, a weight overcharge of $1,208.68, a transportation tax overcharge of $109.30.

The first issue in the Harrison case for determination is whether the claims asserted in the first and second counts thereof are barred by pertinent statutes of limitation.

Another issue, common to all counts, in both actions, (as stipulated by the parties at pre-trial conference and as revealed by the pleadings) is whether the governing freight tariffs covering such shipments, or any official publication to which reference is made in any such tariff, authorize the use of the weights ascertained by weighing said shipments on scales of the defendant, or scales under the jurisdiction of the Western Weighing and Inspection Bureau or other official railway weighing and inspection bureaus; or in certain instances the weight to which the shipper and carrier agreed upon; or, whether the governing tariffs authorize the various weight computations as made by a formula delineated in the evidence of the plaintiff. The third, fourth and fifth counts in the Harrison case present an additional issue as to whether the governing law authorizes the collection of a Federal tax of three percent (3%) upon the amounts paid for the transportation of the shipments there involved.

The issues as to weights of shipments and transportation tax delineated above in the Harrison case are common to each of the claims in the Hites case. In addition thereto, the first three counts in the Hites case present an issue as to whether the governing tariffs authorize a line haul rate of 35¢ per ton of 2,000 pounds, as exacted by defendant for the shipments there involved, or a line haul rate of 30¢ per ton, as claimed by plaintiff. The fifth and sixth counts present an issue as to whether the governing tariffs authorize a line haul rate of 70¢ per ton, as charged by defendant, or a 60¢ per ton rate, as claimed by plaintiff. The seventh count involved the additional issues

as to whether the governing tariffs authorize a switching charge as exacted by defendant on the shipments there considered, or whether such switching charge was unauthorized.

We determine the issues presented in the following order:

### Limitation, Harrison Case

Plaintiff contends that the shipments referred to in the first and second counts of the Harrison case, having moved under a "Uniform Straight Bill of Lading", the overcharges there sought to be recovered is an action on a written instrument and hence under the statutes of the State of Kansas it had five years in which to bring said actions. Plaintiff has not directed our attention to any provision of the bills of lading under which said shipments moved, and we have found none that effects an agreement between the parties thereto, relating to any overcharge of freight rates. In determining whether the claims thus asserted by plaintiff arise under a written contract or by operation of law, the nature of the claim asserted governs. In order to be founded upon an agreement between the parties, the instrument under which such claim is asserted "must itself contain a contract to do the thing, for the nonperformance of which the action is brought." Sunset Pacific Oil Co. v. Los Angeles & S. L. R. Co., 110 Cal.App.Supp. 773, 290 P. 434, 438. The bills of lading here considered do not obligate defendant to return the whole, or any part, of the freight rate specified therein upon the happening of any contingency. On the contrary, by the terms of such bill of lading the plaintiff agreed, upon delivery of the shipments, to pay the amount of "freight * * * and all other lawful charges" specified therein. Under such circumstances, it cannot be said that the claim for overcharge here made arises out of any written agreement between the parties.

An action to recover an illegal freight rate overcharge, such as in the case at bar, is one in assumpsit as for money had and received, arising by operation of law because of defendant's duty, under the law, as a carrier of goods, to avoid discrimination in rates charged shippers.

13 C.J.S., Carriers, § 323, page 773; Sunset Pacific Oil Co. v. Los Angeles & S.L. R. Co., supra. Under the statutes of the State of Kansas (Sec. 60-306, G.S. Kan. 1935), "An action upon contract, not in writing, express or implied; an action upon a liability created by statute, other than a forfeiture or penalty" is barred within three years after accrual. Section 869, R.S.Mo. 1929, Mo.R.S.A. § 1021, a statute of limitation of the State of Missouri, binding on this District Court, provides:

"Whenever a cause of action has been fully barred by the laws of the State, territory or country, in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state."

The cases at bar are actions instituted in the courts of the State of Missouri and removed to this court on the ground of diversity of citizenship. We are governed by the laws of the State of Missouri in our consideration of the issues presented therein. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. It is manifest that at the time of the institution of these actions on February 26, 1946, that the first two counts in the Harrison case were barred by the provisions of the above applicable statutes of limitation. The claims therein asserted arose by operation of law, and not by any provisions of a written instrument. Under such circumstance, the three-year statute of limitation of the State of Kansas, where such actions accrued, applies. Boston Safe Deposit & Trust Co. v. Boyd, 139 Kan. 411, 32 P.2d 218, 92 A.L.R. 1355; Rock Milling & Elevator Co. v. Atchison, T. & S. F. R. Co., 98 Kan. 478, 158 P. 859.

### Weights

The weight, "gross" and "net" of each of the individual shipments in all of the counts of these consolidated actions was "duly ascertained by weighing on scales of the defendant railroad or scales under the jurisdiction of the Western Weighing and Inspection Bureau or other official railway weighing and inspection bureau, or, in the appropriate instances, the weights, net" of such shipments were agreed upon by the shipper and the carrier. (Exhibit 1, Harrison case; Exhibit 4, Hites case.) Plaintiff attacks the defendant's use of such scale, or agreed, weights in calculating the line haul freight charges exacted by defendant for said shipments on the premise that the published tariffs applicable thereto "make no provision for the use of track scale or agreement weights."

Notwithstanding the record in this case is replete with plaintiffs' and defendant's interpretation of the various published freight rate tariffs, which the parties agreed at pre-trial conference are applicable to the shipments in question; we are of the opinion that a decision on this issue of weights, as here involved, can be reached without resolving the conflict in such evidence or by a detailed analysis of the provisions of such tariffs. While it is a violation of law for a carrier to charge higher rates than those provided in a published tariff applicable to a given shipment, whether the carrier has done so is always a question of fact, depending upon the proof in each case. In this case the plaintiffs have the burden of proving that an overcharge in freight rates was exacted of them. To sustain such burden on the issue of weights, it is incumbent upon plaintiff to prove the weight upon which the rate was assessed by the carrier; and, by some substantial, reliable evidence establish the weight upon which the rate should have been calculated, as contended by plaintiffs. The evidence clearly establishes the weight on which the carrier calculated the rate of each shipment. The rate so charged therefor by the carrier is not here in dispute. There is no substantial, reliable evidence in the record establishing the weight of any shipment, as contended by plaintiffs. For that reason, it is unnecessary to here make analysis of the provisions of the various rate tariffs. If such analysis was made, and the carrier was revealed as having made a charge for a weight not provided for in said tariffs, yet plaintiffs would not be entitled to judgment herein on the issue of weights because there is no reliable evidence in the record that establishes with any degree of certainty the weight of the various shipments which plaintiffs contend should be the weight upon which the rate assailed

should have been calculated. In other words, to establish the weight of the various shipments, which plaintiffs contend as being the proper weight that the freight rate should have been calculated on, plaintiffs have devised a formula for the ascertainment of such weights. That formula is so indefinite, speculative and conjectural it does not give rise to legal evidence on that subject. Their formula is this:

The Official Railway Equipment Register is a publication giving the capacities in both weight and cubic feet level full of all freight carrying equipment in the United States, Canada and Mexico. Taking the "marked capacity" of each freight car involved in the shipments in question, as revealed in said Register, plaintiffs arbitrarily select one car from each group shipment. For the selected car, its cubic yard capacity is obtained from the Register. The number of pounds attributed to that car as its "marked capacity" (shown in the Register) is then divided by the number of cubic yards of the car, (also found in the Register) to ascertain the weight of each cubic yard of material involved in such shipments, regardless of the characteristics of such material. The arbitrary weight per cubic yard, as ascertained, is then ascribed to the other cars in each group shipment, by multiplying such cubic yard weight by the number of units of cubical capacity ascertained from the Register for each of the other cars in said shipments. Thus plaintiffs arrive at the respective arbitrary weight of each car used in the shipments and calculate the freight rate therefor on the weight so determined.

To illustrate: Every freight car has a marked capacity on the side thereof, and recorded in the Official Railway Equipment Register as follows, Capacity, Load Limit and Light Weight. The cubical content of such car is shown in said Register. With the above-referred-to Register at hand, plaintiffs select, in the Harrison case A. T. & S. F. Car 17482. The Register reveals such car to have a marked capacity of 100,000 pounds and a cubical capacity level full of 2,022 cubic feet, or approximately 74.88 cubic yards. To plaintiffs' mind such "marked capacity" of said car is "the reasonable physical limit of that vehicle"; which, they say, means a maximum content as to both weight and capacity. Taking the "marked capacity" of such car and dividing the same by its cubic yard capacity, plaintiffs ascertain that each cubic yard of the shipment in that car weighed 1,335.2 pounds. Thus it is plaintiffs' evidence that the contents of that shipment revealing 74.88 cubic yards, which could not weigh more than 1335.2 pounds per cubic yard, according to the "marked capacity" of such car, under plaintiffs' theory an overcharge of "20,720 pounds at the rate of 97 cents per ton of 2,000 pounds", amounting to $10.05, is claimed. Agreement made at pre-trial conference reveals that the actual weight of the shipment in that car was 120,720 pounds net, weighed on track scales of the carrier.)

The evidence reveals that the above-referred-to shipment was sand; that the average weight of sand is from 2,400 to 3,000 pounds per cubic yard, according to wetness. Plaintiffs' evidence does not take into consideration the character of the commodity in any of the shipments in these consolidated actions. In other words, plaintiffs consider sand, gravel, crushed stone and mixed aggregate and sand as having the same characteristic weight per cubic yard in their computation of weights in these cases. Considering only the evidence as to the • characteristic average weight of sand (there is evidence in the record as to the average weight of the other commodities mentioned which were involved in these shipments) and following plaintiffs' formula for calculation of weights the reasonable reliable evidence is that if the freight car above considered was loaded with sand to its full cubical content as asserted by plaintiff the shipment there involved would have weighed 169,712 pounds net; (74.88 cubic yards, at 2,400 pounds per cubic yard) instead of 120,720 as actually weighed on the carrier's scales, and agreed to by plaintiffs.

The average weight per cubic yard as ascertained by plaintiffs from the selected car is thereafter arbitrarily ascribed to each of the other cars involved in the shipments here considered. When such other cars have a cubic capacity less than the selected car, the arbitrary weight figure

adopted by plaintiffs reveals that in some instances plaintiffs ascribe a net content weight of the shipment in those cases as being less than the minimum weight requirement for use of such cars, and plaintiffs claim an overcharge on those shipments which is less than the published tariffs require the carrier to charge for the use of such car.

On the issue of weights, the court declares the law to be: that the apparent fallacy of plaintiffs' theory upon which they claim the freight rates here considered should be computed, does not afford the court any reliable, competent, or reasonable evidence from which any freight rate overcharge here claimed can be legally determined. Before plaintiffs are entitled to recover on such issue, it is incumbent on plaintiffs to establish their damages with reasonable certainty. Compensatory damages cannot be determined by speculation and conjecture. The weight of the shipments in question, as contended by plaintiffs, is purely speculative and conjectural and under the evidence on that issue plaintiffs have not sustained the burden of proof. Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co., 8 Cir., 80 F.2d 32, 44, 102 A.L.R. 688.

### Rates

The first six counts in the Hites case present the only issue as to rates in these consolidated actions. The parties agree that the tariff applicable to all shipments in this case, except those contained in the fifth count, is Western Trunk Line's Freight Tariff No. 210-A, Supplement No. 37. The shipments in Counts 1, 2, 3, and 6 involve shipments from Holliday and Morris, Kansas, (in the Kansas City switching area) to DeSoto and Pauline, Kansas, (outside the Kansas City switching area). As to those shipments, plaintiff in the Hites case, relying upon Item 20(a) in the above tariff, contends that the distance on which the freight rate should be calculated is from Holliday and Morris, Kansas, and not from Kansas City, Missouri, as charged by the carrier. It is also the plaintiff's contention that the carrier applied an interstate rate on intrastate shipments, as all such shipments being between points in

Kansas defendant made an unlawful overcharge by applying a rate determined from Kansas City, Missouri.

Item 20(a) of the W. T. L. Tariff, 210-A, supra, reads as follows: "Single line rates shall be based on shortest distance, origin to destination, over one or more carriers under same control or management." Such provision in said tariff is one of general application. Item 200-M of said tariff specifically providing for a freight rate to be charged on sand, gravel, crushed stone, etc., shipped from Holliday and Morris, Kansas, "to stations in Kansas (except to points in the Kansas City Switching District), requires" that the distance therein specified for such rate "should be arrived at by use of Individual Lines distance tables" and the "distance to be figured from Kansas City, Missouri." The last-mentioned item is a specific provision of said tariff as to how rates for sand, gravel and crushed stone are to be determined when shipped from Holliday and Morris, Kansas. The specific provisions of such tariff and the general provision found in Item 20(a), supra., are not apparently in contradiction. Both provisions may subsist in said tariff and not be destructive of one another. Both such provisions are enforceable when separate shipments, to which said tariff is applicable, are considered. Single line shipments of sand, gravel and cut stone not originating in the Kansas City Switching District or shipped within the district are governed by the above general provision. Shipment of such commodities originating within said switching district destined to points in Kansas, outside the district, are subject to the specific provisions in said tariff. In the construction of railroad tariffs, as in the construction of other written instruments, effect must be given, if possible, to every clause and sentence thereof. Van Dusen Harrington Co. v. Northern Pac. Ry. Co., 8 Cir., 32 F.2d 466. Specific provision qualifying and supplying exceptions to the general provisions thereof are to be retained and given effect when possible. Pillsbury Flour Mills Co. v. Great Northern Ry. Co., 8 Cir., 25 F.2d 66; Great Northern Ry. Co. v. Commodity Credit Corporation, D.C., 77 F.Supp. 780. In

light of the specific tariff provision, supra., which is applicable to the shipments here considered, we believe the carrier properly determined the rate to be charged therefor, by figuring the distance from Kansas City, Missouri, according to individual distance tables of the defendant. The fact that the distance for such shipments was so computed does not make the application of an interstate rate to an intrastate shipment. The "rate" charged by the carrier is one that is fixed by the distance considered in the tariff. The parties agreed upon the applicable published tariff of the carrier to the shipments in suit. Until suspended or set aside, the published rate and point from which such rate is to be calculated is the legal rate to be charged for such shipments. Keogh v. Chicago, N.W.R. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183. In other words, the "rate" from Holliday and Morris, Kansas, (both within the Kansas City Switching District) is not based on the distance from said points, but is based on the distance from Kansas City. Shipments arising in the switching district of Kansas City, all determined by the distance from Kansas City, are the basis for the "rate" charged. Such is approved practice for freight rate charges. St. Paul Ass'n of Commerce v. Chicago, B. & Q. R. Co., 134 Minn. 217, 158 N.W. 982. Zones within which certain rates are applicable to line haul shippers are a recognized method of rate making. The length of haul from different points within such a zone does not make a rate discriminatory or illegal. Cf. Baltimore & O. R. Co. et al. v. United States, D. C., 12 F.Supp. 261; Hallett Construction Co. v. Foley Bros., 191 Minn. 335, 254 N.W. 435.

As to the shipments considered in the fourth count of the Hites case, it is plaintiff's contention that the rate thereon should have been computed from some point in the train yards of the carrier, at Topeka, Kansas, and not from the freight station of the carrier, at said point, because "these particular cars did not go to or from the freight station." Plaintiff says, "They went from the train yards of the railroad, which is probably two and a half miles from the freight station, and

we are simply asking that the lowest distance from the point within the switching district" be used. Item 55, of W.T.L. Tariff 210–A, supra., provides for the use of the Individual Lines distance tables "for list of stations and distances to apply between stations" covered by said tariff. The distance upon which the rate charged for such shipments, was computed by use of A. T. & S. F. Ry. Distance Table No. 9900–C. W. T.L. Tariff 210–A provided for the use of that distance table, and there is no merit in plaintiff's contention that the "rate" charged should be computed on some hypothetical distance. Grand Trunk Ry. Co. of Canada v. Michigan Ry. Comm., 231 U.S. 457, 34 S.Ct. 152, 58 L.Ed. 310.

In Count 5 of the Hites case, the shipments were from Pixley, Missouri, to Pauline, Kansas. The applicable tariff to such shipments is Southwestern Lines Tariff No. 162–S. Said tariff (like W.T.L. Tariff 210–A, supra.), provides that the "rates on crushed stone, gravel and sand", shipped from "Pixley, Missouri, * * * to stations in * * * Kansas" are to be determined "from Kansas City, Mo.–Kan." Plaintiff claims a lower rate on these shipments, on the same theory, as above considered on shipments from Holliday and Morris, Kansas; i.e. the distance should have been determined from Pixley, Missouri, and not "from Kansas City, Mo.–Kan." Pixley, Missouri, is within the Kansas City Switching District. What has heretofore been said relative to shipments from Holliday and Morris, Kansas, disposes of plaintiff's theory concerning shipments from Pixley, Missouri.

### Switching Charges

In the fifth count of the Harrison case and seventh count of the Hites case, plaintiffs claim an overcharge for switching made by a railroad other than defendant, and not absorbed by defendant. The switching in the Hites case was done by the Union Pacific Railroad, that in the Harrison case by the Missouri Pacific. The evidence establishes that the shipments here considered originated on the lines of a connecting carrier and had to be switched to defendant's line for the desired long-haul. A switching charge was imposed by the carrier which did the swit-

914

ching. The switching charge so made was computed pursuant to the tariff of the carrier that did the switching. Item 7870 of A. T. & S. F. Tarriff 7641–W provides for "absorption of foreign lines' switching charges" by defendant. In substance, such provision, with other related tariffs, is that defendant absorbs the whole or a portion of the switching charges of a connecting carrier, at point of origin or at point of destination of a shipment, if the line haul revenue received by defendant exceeds a variable stated sum. Paragraph (c) of Item 7870, supra, reads, "When switching charge, in whole or in part, is not absorbed, such charge, or portion not absorbed, will be in addition to the line haul rate." In the case at bar, the evidence is that the switching charges made by defendant were in accordance with the tariff provisions applicable thereto. There is no evidence in the record to the contrary.

Federal Transportation Tax

■ Plaintiffs' position on this issue is "that the third paragraph, Section (8), Article 1, of the U. S. Constitution, gave no power to the Congress to impose a tax on intrastate commerce (traffic) because the several states saw fit to give such body power only to regulate interstate commerce and among the Indian tribes." The naivete of this assertion appalls us. However, we find palliative relief therefrom, by referring to Clause 1, of Article 1, § 8, of the Constitution of the United States, and the case of Hylton v. United States, 3 Dall. 171, 1 L.Ed. 556, decided by the Supreme Court of the United States at its February Term, 1796, and the subsequent decisions of that Court defining the taxing power of Congress as being as comprehensive as that of the several states, and that the only limitation on such power is as to exports, and the rule of apportionment.

In these consolidated actions, plaintiffs premise their right of recovery upon a theory devoid of probative facts. Under plaintiffs' theory, there is no weight differential between sand, gravel, cut stone, mixed aggregate sand and gravel and feathers. The formula plaintiffs have conjured under such theory is speculative, conjectural and suppositious to the "nth degree". Mr. Justice Holmes once said: "To rest upon a formula is a slumber if prolonged, means death."

Let judgment be entered in favor of defendant, on all counts and issues in these consolidated actions. Counsel prepare formal findings of fact in accordance with this memorandum.