**INDIANA HARBOR BELT RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**GENERAL AMERICAN TRANSPORTATION COMPANY, a corporation, Defendant.**

**INDIANA HARBOR BELT RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**NORTH AMERICAN CAR CORPORATION, a corporation, Defendant.**

**INDIANA HARBOR BELT RAILROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Nos. 70 C 491, 70 C 492, 73 C 114.**

United States District Court,
N. D. Illinois, E. D.

Nov. 7, 1973.

Richard O. Olson, Anna M. Kelly, Chicago, Ill., for Ind. Harbor Belt RR. Co.

Martin M. Lucente, Ronald J. Sklar, Sidley & Austin, Chicago, Ill., for Gen. American Transp. Co. and North American Car Corp.

James Thompson, U. S. Atty., for the U.S.

Hanford O'Hara, Washington, D. C., for I.C.C.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

This controversy began with the filing of two suits in this court in March 1970 by Indiana Harbor Belt Railroad Company ("IHB") to collect switching charges outstanding against General American Transportation Company (Indiana Harbor Belt R. R. Co. v. General American Transportation Co., 70 C 491) and against North American Car Corporation (Indiana Harbor Belt R. R. Co. v. North American Car Corp., 70 C 492), for switching empty privately owned tank cars to and from car repair plants owned by the defendants and located on the Indiana Harbor Belt R. R. Co. The car companies not only denied liability, claiming that the tariff charge assessed by the railroad under its tariff was inapplicable, unreasonable, and unlawful, but also filed counterclaims for refund of similar charges assessed and collected by respondent IHB during the same period on empty privately owned freight cars, other than tank cars, switched to and from repair facilities. The two car company defendants then moved to stay the court actions and refer the issues to the Interstate Commerce Commission for determination. Pursuant thereto, the defendants ("petitioners") filed with the Commission a declaratory order in accordance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 554, for consideration of the issues. In July, 1971, a Commission examiner issued a report and recommended order concluding that IHB's charges were applicable to the movement in question, and that the charges were not unjust or unreasonable.

The car companies filed exceptions to this decision to Division 2. In May 1972, Division 2 issued their report, and concluded that the charges collected and sought to be collected were inapplicable to the movements in question. This report entitled *Charges on Movements of Privately Owned Cars to and from Repair Shops on the Line of Indiana Harbor Belt Railroad Company,* is published at 341 I.C.C. 57.

IHB initiated a third lawsuit, this time against the United States and the Interstate Commerce Commission (73 C 114), to set aside and annul this final Commission determination. Since the ruling in this third lawsuit is dispositive of the issues in the suits against General American Transportation Co. (GATX) and North American Car Corp. (NAC), the three suits are consolidated herein for a ruling on the merits.

Respondent IHB is a belt carrier operating in the Chicago, Ill., switching district. Its switching movements are varied. For example, IHB switches loaded and empty cars between approximately thirty line-haul carriers and industries located on its tracks. It switches

loaded and empty cars handled in overhead traffic between line-haul carriers, and empty cars to and from seven repair facilities located on its tracks. Two of such repair shops are owned and operated by General American and one by North American, these two companies numbering among the largest manufacturers and lessors of freight cars, including tank cars.

The standard local switching charge was published in respondent's tariff 325 series. The tariff in effect at the time of filing of the court actions was designated IHB tariff 325–U, I.C.C. No. 1160 (superseded by a subsequent issue of the tariff on January 1, 1971, not here relevant). The charge assessed for this service was $20.21 per car, but no charge was assessed on empty freight cars switched between line-haul carriers and industries preceding or following a loaded movement, or, as previously stated, on empty tank cars switched to and from repair shops. IHB alleges that the omission to charge for this latter service was an oversight; their attempt to retroactively collect this charge over the past 3 years resulted in the lawsuit and counterclaim already described.

The dispute between the parties relates initially to the proper interpretation of Maurer's Mileage Tariff 7 I.C.C. No. H–32 (Mileage Tariff 7). The issues are directed to Items 25, 30, and 120 of Sec. 1 of Mileage Tariff 7, and Items 140, 145, and 260 of Sec. 2 of that tariff. (Throughout the opinion, reference will be made only to Items 25, 30, and 120 dealing with tank cars. The discussion, however, is equally applicable to other freight cars since Items 140 and 145 of Sec. 2 contain language virtually identical to Items 25 and 30. Item 120 of Sec. 1 and Item 260 of Sec. 2 differ only in that Item 120 provides for free moves at the time of movement, subject to equalization of loaded and empty mileage, whereas Item 260 provides for free moves without restriction.)

Item 25 of Mileage Tariff 7 provides in pertinent part:

Except as otherwise provided herein, these rules govern the payment of mileage allowances and equalization of mileage on tank cars when used by railroads, . . . . for transportation over their lines, including the movement to shops for repairs or reconditioning or returning therefrom . . . .

With regard to the movements covered by Item 25, Item 120 of the tariff describes the carrier's obligation in the following terms:

Except as otherwise provided in Items 25 and 30 (Application and Exception to Application), tank cars will be moved empty without charge at the time of movement . . . on the line of railroads parties to this tariff . . . .

The position of IHB is that Item 30(a) excepts from application of the Mileage Tariff any movement of a private car for which a tariff charge exists. Item 30 provides, as pertinent:

The rules and mileage allowances published herein will not apply on the following: (a) Movement of empty cars for which charges are assessed under tariff authority.

Therefore, since respondent published a switching charge in its own tariff, IHB No. 325–U, on all empty freight cars, it contends such tariff was applicable to the exclusion of the terms of Item 25. The descriptive item in connection with the switching charge was "Railway Equipment on own wheels, viz.: Empty Freight Cars."

Respondent interprets Item 30(a) to mean that the rules and the payment of allowances ordinarily applicable to private cars are inappliable when one of these cars is transported by a carrier on a movement which is neither a revenue move nor a return empty move from a revenue haul. All other movements, it is claimed, are subject to the proper tariff charge. Petitioners object to this interpretation, stating Item 30(a) refers to commercial shipments of empty cars only. They further contend that in any

event, movements to car shops for repairs are to be moved free of charge in accordance with Items 25 and 120 of the Mileage Tariff.

The case is complicated by the fact that none of the railroad companies have behaved over the years in a manner consistent with theories which they are now propounding. The complete disregard of the applicable provisions with respect to the movement of the privately-owned tank cars and the observance of the tariff in connection with privately-owned cars other than tank cars is perplexing. Additionally, and not surprisingly, all parties are able to spew forth conflicting "normal rules of tariff interpretation" to support their contentions. For example, petitioners cite the principles that ambiguous tariff provisions must be construed against the carrier and in favor of the shipper; e. g., Norwich Wire Works, Inc. v. Boston and M. R., 232 ICC 593, 596 (1939); Atlantic Coast Line R. Co. v. Atlantic Bridge Co., 57 F.2d 654, 656 (5th Cir. 1932); and that exceptions to a tariff's general application provision must be clear and specific in order to be effective; e. g., Conn Celery Co. v. A. C. L. R. R., 292 ICC 761, 765; Durez Plastics & Chemicals, Inc. v. CM St. P. P. R. Co., 259 ICC 335, 338. Respondent suggests, however, that "despite repeated findings to the effect that tariff ambiguities must be resolved against the framer of the tariff, this principle may not be successfully invoked where, in a given issue, there is a total absence of rates," Buckeye Cotton Oil Co. v. A. & S. Ry. Co., 157 ICC 657, 658; and that "in construction of railroad tariffs, effect must be given, if possible, to every clause and sentence thereof. Specific provisions qualifying and supplying exceptions to the general provisions thereof are to be retained and given effect where possible." Harrison Eng. and Construction Corp. v. A. T. & S. F. Ry., D.C., 78 F. Supp. 906, 912.

Clearly, these kind of principles, while occasionally helpful, are of greatest use when a court has already determined what the result in a given case shall be. However, this fact situation—at least as explored superficially—is one in which good judgment could favor either contestant. When such a situation arises, it is essential to view the Items in suit in the larger perspective of their interrelationship to the entire scheme of railroad charges and tariffs. In this regard we find the report of the Hearing Examiner particularly well-reasoned and persuasive. The consequences of the decision in this case must be reviewed in light of the purposes of the Interstate Commerce Act:

> to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers . . . . all to the end of developing, coordinating and preserving a national transportation system . . . adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the National Defense. All provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy. 49 U.S.C. § 1.

The Hearing Examiner is particularly mindful that IHB is a switching line; it does not participate in line-haul rates and, consequently, does not share in any of the revenue derived therefrom by the line-haul carriers. This distinction is constantly glossed over by the Division 2 report, and it is a distinction which severely weakens the foundation upon which much of their precedent rests. As the Report of the Hearing Examiner, p. 14, notes:

> This is a factor which distinguishes the considered movements of empty cars from those movements reviewed by the Commission and the courts in the cited proceedings. It is a significant difference. Line-haul carriers

that perform like switching of empty private cars for repairs, as a part of the empty return movement do have at least the benefit of the revenue derived from the movement of that car when loaded with shippers' freight, but there is no revenue to offset the cost to the switching carrier for performing this service. . . . .

Since no revenue is produced by the considered switch movements and, contrary to petitioner's allegations, the line-haul freight charges are not shown to include a cost factor for all such extraordinary movements, there is no basis for assessing the cost thereof against the line-haul carriers that interchange the privately owned empty cars with the respondent. The charges paid by shippers using a privately owned car for the movement of their freight does include a factor for the return of the empty car but not for all subsequent movement of the empty car. The cost of the switch movement to and from the repair shops performed by the respondent is properly chargeable to the car owner, carrier or non-carrier, who receives the benefit of the service. The record here shows that charges for switch movements to and from repair facilities are assessed against carrier owned cars and there is no sound basis for concluding that a different course of action should be followed in connection with non-carrier owners of cars. The petitioning car owners collect mileage allowances for the use of the privately owned cars by the railroads and it is not unreasonable to require that they assume the cost of the extraordinary movements to and from their repair facilities when such movements are separate and distinct from the normal return of the empty car.

█ But this court would be remiss to end our discussion at this juncture, for, as we are reminded by petitioners, our scope of review here is sharply restricted. Illinois Central Railroad Company v. United Sates, 263 F.Supp. 421, 430 (N.D.Ill.1966), aff. 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967). Once this court finds substantial evidence in support of the Commission's findings, it cannot go further and inquire into the soundness of the Commission's reasoning or the wisdom of the result. Virginian Ry. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926). Nonetheless, we have a recognized obligation under 5 U.S.C. § 706(2)(A), to set aside agency conclusions found to be "otherwise not in accordance with the law." In this instance, we find that the conclusions reached by Division 2 precipitate a violation of Sec. 2 of the Act, which prohibits and declares unlawful any unjust discrimination by a common carrier. The discrimination arises in that charges for switch movements to and from repair facilities are assessed against carrier-owned cars, whereas the Commission concludes, without adequate basis, that a different course of action obtains in connection with non-carrier owner of cars.

█ In Use of Private Passenger Train Cars, 155 ICC 775, 786, the Commission states:

Freight cars in regular service are not subject to transportation charges but such cars are subject to charges when the transportation is not in regular service. The consolidated classification provides certain charges per car per mile for the transportation of all kinds of railway equipment on their own wheels . . . . These charges apply on new cars moving from the place of manufacture to the home line before being placed in service, *also on cars moving empty to and from repair shops off the home line,* and on any other movements over foreign lines not in regular service. (emphasis added)

The Commission argues that a repair move is an incident to transportation justifying exemption from any charge. But as IHB notes, this is inconsistent with the fact that empty repair moves of freight cars owned by other railroads which come into these plants and which

are also instrumentalities of transportation are subject to the switch charge in Tariff 325–U. Use of Private Passenger Train Cars, *supra,* clearly states that repair moves of cars of one carrier over the tracks of another is for the benefit of the carrier owning the car, and hence subject to freight charges. It seems clear, particularly in light of Section 2 of the Interstate Commerce Act, that the same must hold true of repair moves of privately-owned cars coming on the line of a carrier that does not use or have any interest in those cars and does not derive any revenue from them.

The court concludes that the findings and conclusions of Division 2 of the Commission result in a violation of 49 U.S.C. § 2, and are otherwise unsound in respect to implementing the declared policy of the Interstate Commerce Act as set forth in 49 U.S.C. § 1. Judgment is entered in favor of plaintiffs and against defendants in lawsuit 73 C 114; by agreement of the parties, the other two lawsuits are dismissed without prejudice to any defenses, especially to a defense of the Statute of Limitations, with leave to reinstate the actions upon notice as a matter of course.